# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| N.P. and P.S., individually and on behalf of all others similarly situated, | Case No. 1:16-cv-8655 |
| *Plaintiffs,* | Honorable Virginia M. Kendall |
| *v.* | |
| STANDARD INNOVATION CORP., d/b/a WE-VIBE, a Canadian corporation, | |
| *Defendant.* | |

## PLAINTIFFS' MOTION FOR AND MEMORANDUM IN SUPPORT OF
## <u>PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT</u>

## TABLE OF CONTENTS

I.    **INTRODUCTION** ...................................................................................................1

II.   **BACKGROUND** ....................................................................................................2

     A.    **Nature of the Litigation** ..........................................................................2

     B.    **History of the Proceedings** ....................................................................5

III.   **TERMS OF THE SETTLEMENT** ......................................................................6

     A.    **Class Definition** ......................................................................................6

     B.    **Monetary Relief** ......................................................................................7

     C.    **Additional Relief** ....................................................................................8

           1.    *Prospective Relief* ..........................................................................8

           2.    *Payment of Notice and Settlement Administration Expenses* ....................8

           3.    *Incentive Award for Class Representatives* ...................................9

           4.    *Payment of Attorneys' Fees and Expenses* .................................9

     D.    **Release of Liability** ................................................................................9

IV.   **THE PROPOSED SETTLEMENT CLASSES SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES** .....................................................................10

     A.    **Each Settlement Class is Sufficiently Numerous Ascertainable**....................10

     B.    **Members of the Settlement Classes Share Common Questions of Law and Fact that Predominate Over Any Individual Issues** ........................11

           1.    *Common Questions Predominate with Respect to the App Class* ...........12

           2.    *Common Questions Predominate with Respect to the Purchaser Class*....................14

     C.    **P.S.'s Claims are Typical of those of the Purchaser Class Members' Claims and N.P.'s Claims are Typical of those of the App Members' Claims** ........................................................................................................15

     D.    **Plaintiffs and Class Counsel Will Adequately Represent the Interests of Both Settlement Classes** ...................................................................15

      **E.**     **A Class Action is the Superior Method of Adjudicating this Controversy** .................................................................................18

**V.**     **PLAINTIFFS' COUNSEL SHOULD BE APPOINTED CLASS COUNSEL**……...18

**VI.**    **THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL** .........................................................................................20

      **A.**     **The Strength of the Plaintiffs' Case Compared to the Amount of the Settlement Offer Favors Preliminary** .......................................21

      **B.**     **The Potential Length, Complexity, and Expense of Further Litigation Favor Preliminary Approval** ...........................................26

      **C.**     **The Opinion of Competent Counsel Supports Preliminary Approval** ...........26

      **D.**     **The Stage of the Proceeding and the Amount of Discovery Completed Support Preliminary** .............................................27

**VII.**    **THE PROPOSED METHOD OF NOTICE SHOULD BE APPROVED** .................28

**VIII.**  **CONCLUSION** .........................................................................................30

## <u>TABLE OF AUTHORITIES</u>

### <u>United States Supreme Court Cases</u>

*Amchem Prods. Inc. v. Windsor*,
    521 U.S. 591 (1997) ................................................................................ 10, 18

*Amgen Inc. v. Connecticut Ret. Plans and Tr. Funds*,
    133 S. Ct. 1184 (2013) .................................................................................. 12

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ..................................................................................... 28

*Gourley v. Google, Inc.*,
    137 S. Ct. 36 (2016) ..................................................................................... 25

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................................ 10, 11, 12

### <u>United States Circuit Court of Appeals Cases</u>

*Armstrong v. Bd. of Sch. Directors of City of Milwaukee*,
    616 F.2d 305 (7th Cir. 1980) .................................................................. 20, 21, 27

*Bell v. PNC Bank, N.A.*,
    800 F.3d 360 (7th Cir. 2015) ....................................................................... 11

*Eubank v. Pella Corp.*,
    753 F.3d 718 (7th Cir. 2014) ..................................................................... 21-22

*Felzen v. Andreas*,
    134 F.3d 873 (7th Cir. 1998) ....................................................................... 20

*Gomez v. St. Vincent Health, Inc.*,
    649 F.3d 583 (7th Cir. 2011) ....................................................................... 16

*Isby v. Bayh*,
    75 F.3d 1191(7th Cir. 1996) ................................................................... *passim*

*Keele v. Wexler*,
    149 F.3d 589 (7th Cir. 1998) ....................................................................... 15

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012)........................................................................ 23

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ....................................................................... 12

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) ................................................................. 10, 11

*Muro v. Target Corp.*,
    580 F.3d 485 (7th Cir. 2009) ........................................................................ 15

*Nix v. O'Malley*,
    160 F.3d 343 (6th Cir. 1998) ....................................................................... 25

*Reliable Money Order, Inc. v. McKnight Sales Co.*,
    704 F.3d 489 (7th Cir. 2013) ....................................................................... 19

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) .................................................................. 12, 14

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
    463 F.3d 652 (7th Cir. 2006) ....................................................... 20, 21, 26, 27

**United States District Court Cases**

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
    No. 07 CV 2898, 2012 WL 651727 (N.D. Ill. Feb. 28, 2012) ........................ 21, 22, 27

*Birchmeier v. Caribbean Cruise Line, Inc.*,
    302 F.R.D. 240 (N.D. Ill. 2014) ............................................................. 10, 11, 18

*Burrow v. Sybaris Clubs Int'l, Inc.*,
    No. 13 C 2342, 2015 WL 1887930 (N.D. Ill. Apr. 24, 2015) ............................. 13

*Butler v. Am. Cable & Tel., LLC*,
    No. 09 CV 5336, 2011 WL 2708399 (N.D. Ill. July 12, 2011) ........................... 18

*Chandler v. Sw. Jeep-Eagle, Inc.*,
    162 F.R.D. 302 (N.D. Ill. 1995) ................................................................... 10

*Ferrington v. McAfee, Inc.*,
    No. 10–CV–01455, 2012 WL 1156399 (N.D. Cal. Apr. 6, 2012) ....................... 22

*Forcellati v. Hyland's, Inc.*,
    No. CV 12-1983-GHK MRWX, 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) .......... 22

*G.M. Sign, Inc. v. Grp. C Commc'ns, Inc.*,
    No. 08-cv- 4521, 2010 WL 744262 (N.D. Ill. Feb. 25, 2010) ............................ 11

*Gascho v. Global Fitness Holdings, LLC*,
    No. 2014 WL 1350509 (S.D. Ohio Apr. 4, 2014) ........................................22-23

*Halaburda v. Bauer Publ'g Co.*,
    No. 12-cv-12831, Dkt. 68 (E.D. Mich. Jan 6. 2015) ........................................24

*Harris v. Circuit City Stores, Inc.*,
    No. 07-cv-2512, 2008 WL 400862 (N.D. Ill. Feb. 7, 2008)........................18-19

*Harris v. comScore, Inc.*,
    292 F.R.D. 579 (N.D. Ill 2013)........................................13, 14, 17, 19

*In re AT & T Mobility Wireless Data Servs. Sales Litig.*,
    270 F.R.D. 330 (N.D. Ill. 2010)........................................*passim*

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*,
    789 F. Supp. 2d 935 (N.D. Ill. 2011) ........................................21, 26, 27

*In re Capital One TCPA Litig.*,
    80 F. Supp. 3d 781 (N.D. Ill. 2015)........................................22

*In re Carrier IQ, Inc. Consumer Privacy Litig.*,
    No. 12-md-02330-EMC, Dkt. 481 ........................................24

*In re Facebook Internet Tracking Litig.*,
    140 F. Supp. 3d 922 (N.D. Cal. 2015)........................................24

*In re Facebook Privacy Litig.*,
    No. 10-cv-02389, Dkt. 69 (N.D. Cal. 2010)........................................17

*In re Google Buzz Privacy Litig.*,
    No. C 10-00672 JW, 2011 WL 7460099 (N.D. Cal. June 2, 2011) ........................................23

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
    806 F.3d 125 (3d Cir. 2015) ........................................24-25

*In re Netflix Privacy Litig.*,
    No 5:11-cv-00379 (N.D. Cal. Aug. 12, 2011) ........................................19

*In re Northfield Labs., Inc. Sec. Litig.*,
    No. 06-cv-1493, 2012 WL 366852 (N.D. Ill. Jan. 31, 2012) ........................................20, 28

*In re Sears, Roebuck & Co. Front-loading Washer Prod. Liab. Litig.*,
    No. 06 C 7023, 2016 WL 772785 (N.D. Ill. Feb. 29, 2016) ........................................28

*In re Southwest Airlines Voucher Litig.*,
No. 11-cv-8176, 2013 WL 4510197 (N.D. Ill. Aug. 26, 2013) ........................................22

*Kessler v. Am. Resorts Int'l*, No. 05-cv-5944,
No. 2007 WL 4105204 (N.D. Ill. Nov. 14, 2007) ..........................................................21

*Kinder v. Meredith*,
No. 1:14-cv-11284-TLL-CEB, Dkt. 81 (E.D. Mich. May 18, 2016) ..........................23-24

*Lauber v. Belford High Sch.*,
No. 09-CV-14345, 2012 WL 5822243 (E.D. Mich. Jan. 23, 2012) ............................14-15

*Otero v. Dart*,
306 F.R.D. 197 (N.D. Ill. 2014) ................................................................................ 16, 18

*Quiroz v. Revenue Prod. Mgmt., Inc.*,
252 F.R.D. 438 (N.D. Ill. 2008) ....................................................................................... 18

*Rojas v. Career Educ. Corp.*,
No. 10-cv-5260, Dkt. 55 (N.D. Ill.) ................................................................................. 17

*Schulte v. Fifth Third Bank*,
805 F. Supp. 2d 560 (N.D. Ill. 2011) .............................................................................. 26

*Schulte v. Fifth Third Bank*,
No. 09-CV-6655, 2010 WL 8816289 (N.D. Ill. Sept. 10, 2010)................................25-26

*Subedi v. Merchant*, No. 09-cv-4525,
No. 2010 WL 1978693 (N.D. Ill. May 17, 2010)............................................................. 18

*Tait v. BSH Home Appliances Corp.*,
No. SACV100711DOCANX, 2015 WL 4537463 (C.D. Cal. July 27, 2015).................23

## **Rules and Statutes**

18 U.S.C.A. § 2520 ....................................................................................................22, 24

Fed. R. Civ. P. 23 ..................................................................................................*passim*

## **Miscellaneous Authority**

U.S. Chamber Institute for Legal Reform, *The New Lawsuit Ecosystem: Trends, Targets
and Players* (October 2013) (available at http://www.instituteforlegalreform.com/uploads
/sites/1/The_New_Lawsuit_Ecosystem_pages_web.pdf) .............................................. 19

## I.    INTRODUCTION

Plaintiffs N.P. and P.S. ("Plaintiffs") seek preliminary approval of a class action settlement that, if approved, will resolve claims that Defendant Standard Innovation Corp. ("Standard Innovation" or "Defendant") wrongfully collected highly sensitive personal information about its customers' usage habits of its "We-Vibe" line of adult sex toys (vibrators). The proposed settlement agreement ("Settlement Agreement" or "Agreement")[1]—reached after extensive arms' length negotiations and multiple informal and formal mediation sessions with the Honorable Morton Denlow (ret.) of JAMS Chicago—is an excellent result for the proposed classes. It achieves the dual purposes of the suit by providing both significant monetary compensation and cessation of Defendant's allegedly invasive information collection practices.

Regarding the monetary component, the Agreement calls for Standard Innovation to establish two non-reversionary common funds totaling $5,000,000 Canadian dollars ("CAD"), to be distributed to two settlement classes: an "App Class" and a "Purchaser Class." The App Settlement Fund is a $4,000,000 (CAD) (about $3,000,000 US dollars) and the Purchaser Settlement Fund is a $1,000,000 (CAD) (about $750,000 US dollars). Claiming members of the App Class are expected to get a *pro rata* payment of approximately $500 and claiming Purchaser Class members a *pro rata* payment of approximately $40, each payment coming in U.S. Dollars. As far as the prospective relief, it is far reaching in that the Agreement requires Standard Innovation to destroy data is has collected, alter its privacy policy, and implement certain protocols to ensure that its privacy practices remain consistent with its disclosures to consumers.

Without question, the instant Settlement compares favorably to the majority of privacy class action settlements, which often result in, at best, nominal amounts of money being paid directly to the class, and most often indirect payments through *cy pres* donations. *See infra* at

---

[1]    A copy of the Settlement Agreement is attached as Exhibit 1.

Section VI.A. Here, Class Counsel has secured a total of $5 million (CAD) that will result in substantial payments to App Class members of hundreds of dollars and still meaningful payments to Purchaser Class members expected to be more than what's been recovered in most other privacy settlements. Coupled with the significant prospective relief, the proposed Agreement goes well beyond the established paradigm when it comes to privacy class action settlements. Given the substantial recovery made available in the face of the significant risks attendant with further litigation—including summary judgment, class certification, trial, and appeal—the instant Settlement is well within the range of approval.

Accordingly, Plaintiffs respectfully request that the Court enter an Order (i) certifying the proposed Settlement Classes for settlement purposes, (ii) granting preliminarily approval to the Agreement, and (iii) approving the proposed Notice Plan.

## II.     BACKGROUND

### A.     Nature of the Litigation

Standard Innovation markets, sells, and supports a line of vibrators under the "We-Vibe" product label. The We-Vibe's principle selling point is that users can control the device—e.g., by adjusting its intensity and vibration patterns—via a smartphone. (*See* Plaintiff's First Amended Class Action Complaint "Compl." attached as Exhibit 2 at ¶¶ 20, 21.) To access these functions, customers must download Standard Innovation's We-Connect application (the "We-Connect" or "App"), which allows users to "pair" a specific We-Vibe to a smartphone via a Bluetooth connection. (*Id*. ¶ 13.) The App also allows different We-Connect users to communicate with each other. (*Id*. ¶ 14.) For example, through We-Connect's "connect lover" feature, users can send messages, engage in video chats, and remotely control their partner's We-Vibe device in real time. (*Id*.) All of these features are central to the We-Vibe product. (*Id*. ¶¶ 18, 19.)

While the We-Vibe device gives users a unique way to intimately communicate and interact, Plaintiffs allege that Standard Innovation also programmed—without its customers' knowledge or consent—the We-Connect application to collect a substantial amount of information about its customers' usage habits. (*Id.* ¶ 20.) For example, Plaintiffs claim that Standard Innovation programmed the application to (i) monitor and record how its customers use their devices in real time (i.e., by continuously and contemporaneously intercepting and monitoring electronic communications between a user's smartphone and the We-Vibe device), and then (ii) collect and transmit this data to Standard Innovation servers in Canada. (*Id.* ¶¶ 2, 21, 22.) The information collected allegedly includes: the date and time of each use, the vibration intensity level selected by the user, the vibration mode or pattern selected by the user and, where available, the email address of customers who registered with We-Connect. (*Id.* ¶ 20.) Standard Innovation also allegedly collected information through We-Connect's "connect lover" feature (e.g., data related to the connected We-Vibe, including its temperature and battery life). (*Id.* ¶ 23.) And as noted above, as this information was collected, it was transmitted to Standard Innovation's servers in Canada. (*Id.* ¶ 2.)

Needless to say, the usage information collected by Standard Innovation through We-Connect is extraordinarily intimate and private. That users might consider this information highly sensitive and threatening to their privacy is a fact that has been recognized (and anticipated) by Standard Innovation itself: rather than inform customers about its allegedly intrusive collection practices—which Plaintiffs claim operate without customers' knowledge or consent—the We-Connect application assured users that the application was "secure" and could initiate "a secure connection between . . . smartphones." (*Id.* ¶ 14, 23.) Notwithstanding these representations of security and confidentiality, Standard Innovation collected individual-level

usage information—often tied to users' personally identifiable email addresses—and as a result, Plaintiffs allege Standard Innovation breached its customers' trust, devalued their purchases (given that few, if any, consumers would knowingly purchase a vibrator that was subject to constant surveillance), and violated federal and state law in the process. (*Id*. ¶¶ 3, 24.)

Plaintiff N.P., representing the proposed App Class, purchased a We-Vibe Rave vibrator from a local retailer for $130 for her own personal use. (*Id*. ¶ 25.) Soon after the purchase, Plaintiff N.P. downloaded We-Connect onto her smartphone and paired it with her We-Vibe. (*Id*. ¶ 27.) She did so in order to access the We-Vibe's full array of features and to control her We-Vibe wirelessly from her smartphone. (*Id*.) Since her purchase of the We-Vibe in May 2016, Plaintiff N.P. has used We-Connect on several occasions. (*Id*. ¶ 28.) Unbeknownst to Plaintiff N.P., she claims Defendant programmed We-Connect to secretly intercept, monitor, collect, and transmit her Usage Information. (*Id*. ¶ 29.) Accordingly, each and every time Plaintiff N.P. used We-Connect to control her We-Vibe, Defendant intercepted and collected her personally identifiable We-Vibe usage information, and transmitted it to its servers in Canada. (*Id*. ¶ 30.) Plaintiff N.P. further alleged that Defendant never informed her that it would monitor, collect, and transmit her usage information and Plaintiff never expressly consented to Defendant doing so. (*Id*. ¶¶ 31, 32.) Plaintiff N.P. would never have purchased a We-Vibe had she known that utilizing its full functionality would allow Defendant to monitor, collect, and transmit her Usage Information through We-Connect. (*Id*. ¶ 33.)

Plaintiff P.S., representing the proposed Purchaser Class, bought a We-Vibe 4 Plus vibrator from a local retailer for $193. (*Id*. ¶ 34.) The We-Vibe 4 Plus's product packaging—like the product packaging of all Defendant's Bluetooth enabled devices in the We-Vibe line—touted its App-compatibility and Bluetooth functionality (via We-Connect). (*Id*. ¶ 35.) As a result of

4

those features, the purchase price for each the Bluetooth enabled devices in the We-Vibe product line (specifically, the We-Vibe® Classic, We-Vibe® 4 Plus, We-Vibe® 4 Plus App Only, Rave by We-Vibe™ and Nova by We-Vibe™ products), is substantially higher than other comparable vibrators without those features. (*Id*.) Unbeknownst to Plaintiff P.S. at the time of his purchase, Defendant allegedly programmed We-Connect to secretly monitor, collect, and transmit its users' Usage Information to We-Vibe's servers. (*Id*. ¶ 36.) Plaintiff would not have purchased the We-Vibe (or would have paid substantially less) had he known that Defendant would monitor, collect, and transmit Usage Information about users through the We-Connect app (which users were required to use in order to access the product's full functionality). (*Id*. ¶ 37.)

> **B.       History of the Proceedings.**

On September 2, 2016, Plaintiff N.P. filed a putative class action lawsuit against Standard Innovation. (Dkt. 1.) Plaintiff N.P. then filed an amended complaint on February 27, 2017, adding, *inter alia*, Plaintiff P.S. as an additional named plaintiff and proposed representative of the Purchaser Class and substituting Standard Innovation Corporation as the Defendant. The amended complaint alleged three (3) causes of action for (i) violation of the Federal Wire Tap Act, 18 U.S.C. §§ 2510 et seq., (ii) Intrusion Upon Seclusion, and (iii) Unjust Enrichment. (Compl. ¶¶ 46, 52, 60.)

Early on, the Parties sought a resolution of this matter. (*See* Declaration of Eve-Lynn Rapp, attached at Exhibit 3, ¶ 4.) As part of their discussions, the Parties informally exchanged information related to Defendant's information collection practices, Defendant's privacy policies, the information they disclosed to consumers, the number of class members, available insurance, and Defendant's financial resources. (*Id.*) After the exchange of information, counsel for the Parties met in person on October 20, 2016 to discuss substantive issues involved in the

case and possible structures for resolution. (*Id.* ¶ 5.) Ultimately, the Parties agreed to attempt to resolve the matter through private mediation with the Honorable Morton Denlow (Ret.) of JAMS Chicago and that Defendant's insurer, Liberty International Underwriters ("Liberty") should be present for those negotiations. (*Id.* ¶ 6.) In the weeks that followed, and in hopes of furthering the negotiations, Plaintiffs also made a policy demand on Liberty. (*Id.* ¶ 7.)

On November 22, 2016, Plaintiffs' counsel, Defendant's counsel, Defendant's corporate representatives, and a representative from Liberty, participated in a formal mediation session with Judge Denlow. (*Id.* ¶ 8.) At the time of their early meeting and since making their policy demand, Plaintiffs were clear that Standard Innovation would have to change its data collection practices and given Defendant's limited financial resources, if any resolution was to occur at an early stage, Liberty would have to put up the entirety of Standard Innovation's $5 million CAD insurance policy. (*Id.* ¶ 9.) After several rounds of arms' length negotiations over the course of a full day, the Parties were able to reach an agreement as to the principal terms of this Agreement, which was formalized in a binding Memorandum of Understanding. (*Id.* ¶ 10.) After that, it took several additional weeks of discussions and negotiations to hammer out all the details of the Settlement now before the Court. (*Id.* ¶ 11.)

## III.    TERMS OF THE SETTLEMENT

The terms of the Agreement are set forth in the Settlement Agreement (*see* Ex. 1), and are briefly summarized as follows.

### A.    Class Definition.

The Settlement Agreement provides for a two Classes, defined as follows:

> **App Class**: All individuals in the United States who downloaded the We-Connect application and used it to control a We-Vibe Brand Product before September 26, 2016.

6

> **Purchaser Class**: All individuals in the United States who purchased a Bluetooth enabled We-Vibe brand product before September 26, 2016.

The covered devices are detailed in the Settlement. (*See* Ex. 1, ¶ 1.40 listing the We-Vibe® Classic, We-Vibe® 4 Plus, We-Vibe® 4 Plus App Only, Rave by We-Vibe™ and Nova by We-Vibe™ products as the We-Vibe devices included in the Settlement.) Excluded from the Settlement Classes are: (a) any judge or magistrate presiding over the Action and the immediate family members of any such Person(s); (b) the Defendant and any respective parent, subsidiary, affiliate, successor, predecessor or any entity in which the Defendant or its parents have a controlling interest, as well as its current or former officers, directors, agents, attorneys, servants, or employees; (c) the Settlement Administrator; (d) the Mediator; (e) Persons who properly execute and file a timely request for exclusion from the App Class and/or the Purchaser Class; (f) and the legal representatives, successors, or assigns of any such excluded Persons.

### B. Monetary Relief.

Standard Innovation has agreed to establish two Settlement Funds with the full $5 million CAD of its insurance policy. The Purchaser Settlement Fund is a non-reversionary $1 million CAD fund from which each member of that class who submits a valid claim will receive a *pro rata* share of the money remaining in that settlement fund, up to $199.00 (USD), after payment of all Settlement Administration Expenses, incentive awards to the Class Representatives, and the Fee Award to Class Counsel. (*Id.* ¶ 2.1 – 2.2(a).) Similarly, the App Settlement Fund is a non-reversionary $4 million CAD fund from which each App Class Member who submits a valid claim will receive a *pro rata* share of the money remaining in the Settlement Fund, up to $10,000 (USD), after payment of all Settlement Administration Expenses, incentive awards to the Class Representatives, and the Fee Award to Class Counsel. As explained below, Plaintiffs estimate that, based on the expected rate of claims, each App Class member who submits a valid claim

will receive approximately $500 and each Purchaser Class member who submits a valid claim will receive approximately $40.

### C. Additional Relief.

In addition to the individual relief to the settlement classes provided above, Standard Innovation has also agreed to provide the following additional relief.

#### 1. Prospective Relief

Standard Innovation has agreed to delete all of the following data: email addresses provided as part of the We-Connect application registration process, the time and date of each use, the vibration intensity level selected by the user, the vibration mode or pattern selected by the user, the temperature, and the battery life. (*Id*. ¶ 2.3(g).)

Going forward, for at least three years Defendant will not include a registration process on the We-Connect application and not collect email addresses through the We-Connect application (excluding email addresses provided by users specifically to receive the Standard Innovation newsletter or register their product). (*Id*. ¶ 2.3(a).) Additionally, Standard Innovation has already updated its privacy notice about its data collection practices with respect to the We-Connect application and will inform those who have downloaded the App of their data collection practices. (*Id*. ¶ 2.3(d)-(e).) Although it will no longer collect personal user information, to the extent that Defendant collects data in aggregate in non-identifiable form for internal analytics purposes, Defendant shall (i) provide notice of this data collection practice in the privacy notice, and (ii) provide application users with a method to opt out of their data being provided to the third party for such purposes. (*Id*. ¶ 2.3(c).)

#### 2. Payment of Notice and Settlement Administration Expenses

Standard Innovation has agreed to pay, proportionally from the respective settlement

funds, the cost of sending the Notice set forth in the Agreement and any other notice as required by the Court, as well as all costs of administration of the Agreement. (*Id.* ¶¶ 2.1, 4.1.)

> ### 3. Incentive Award for Class Representatives

In addition to the relief received as Class Members under the Settlement, and in recognition of their efforts on behalf of the Settlement Classes, particularly in a case of this sort that involves highly private and sensitive issues, Standard Innovation has agreed to pay each of the Plaintiffs, subject to Court approval, an incentive award of $5,000 from each respective settlement fund. (*Id.* ¶ 8.3.)

> ### 4. Payment of Attorneys' Fees and Expenses

Class Counsel will move the Court for an award of reasonable attorneys' fees and unreimbursed expenses incurred in the Action relative to each fund. (*Id.* ¶¶ 8.1, 8.2.) Class Counsel has agreed, with no consideration from Defendant, to limit their request to one-third of the Purchaser Settlement Fund and one-third of the App Settlement Fund. (*Id.* ¶¶ 8.1, 8.2.)

**D.   Release of Liability.**

In exchange for the relief described above, Standard Innovation, and each of its affiliated and/or related entities, will receive a full release of all claims arising out of or based on (i) any actual or alleged collection, use or misuse, disclosure, storage or any other processing of any personal or other information by the Released Parties, including without limitation the collection, use or misuse, disclosure, storage or any other processing of any information in connection with the purchase of a We-Vibe Brand Product or in connection with the We-Connect Application, (ii) the alleged disclosure, partial disclosure or non-disclosure of any information practices by the Released Parties with respect to any We-Vibe Brand Product or the We-Connect Application, whether disclosed, partially disclosed or undisclosed, or (iii) any allegations of deceptive conduct

9

with respect to the sale of any We-Vibe Brand Product or the We-Connect Application. (*See Id*.

¶¶ 1.33-1.35, for complete release language.)

## IV.    THE PROPOSED SETTLEMENT CLASSES SHOULD BE CERTIFIED FOR SETTLEMENT PURPOSES

Before granting preliminary approval, the Court must determine that proposed settlement classes are each appropriate for certification. *See Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 621 (1997); *In re AT & T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 340-345 (N.D. Ill. 2010) (citations omitted). To merit certification, the proposed classes must meet the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *See* Fed. R. Civ. P. 23(a). Also, because Plaintiffs seek to recover money damages on behalf of the classes, they must demonstrate that the proposed classes meet Rule 23(b)(3)'s requirements of predominance and superiority. *See* Fed. R. Civ. P. 23(b); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011); *In re AT & T*, 270 F.R.D. at 344-45. Finally, a Rule 23(b)(3) class also must be ascertainable, that is, be defined by objective criteria. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

As described further below, both proposed classes satisfy each prerequisite and should therefore be certified.

### A.    Each Settlement Class is Sufficiently Numerous and Ascertainable.

Rule 23(a)'s first threshold requirement—numerosity—is satisfied where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *In re AT & T*, 270 F.R.D. at 341; *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 250 (N.D. Ill. 2014) (citation omitted). Although there is no "magic number" at which joinder becomes impracticable, the numerosity requirement is usually met when the class is comprised of forty or more persons. *See Birchmeier*, 302 F.R.D. at 250; *Chandler v. Sw. Jeep-Eagle, Inc.*, 162 F.R.D.

302, 307 (N.D. Ill. 1995) (citations omitted) (finding proposed classes of 50 and 150 persons numerous). Here Defendant's records indicate that approximately 300,000 individuals purchased a Bluetooth enabled We-Vibe product before September 26, 2016 (and are thus members of the "Purchaser Class") and that in excess of 100,000 individuals downloaded the We-Connect application and used it to control a We-Vibe Brand Product before September 26, 2016 (and are thus members of the "App Class"). (Ex. 3, Rapp Decl. ¶ 13.) Given the nature of the We-Vibe and the We-Connect App, a not insignificant number of consumers will be members of both classes. As such, Rule 23(a)'s numerosity requirement is clearly satisfied.

Additionally, although not an express requirement of Rule 23, it is an implicit requirement that the certified class be ascertainable. *See Mullins*, 795 F.3d at 659. To be "ascertainable," the class need only be defined by objective criteria. *Id.* Because membership in the classes here is based on straightforward objective criteria—purchase of a We-Vibe and/or downloading of the We-Connect App—the ascertainability requirement is also easily satisfied. *See Birchmeier*, 302 F.R.D. at 245; *G.M. Sign, Inc. v. Grp. C Commc'ns, Inc.*, No. 08-cv- 4521, 2010 WL 744262, at *4 (N.D. Ill. Feb. 25, 2010).

### B. Members of the Settlement Classes Share Common Questions of Law and Fact that Predominate Over Any Individual Issues.

Rule 23(a)(2) instructs that a class may be certified only if there exist "questions of law or fact common to the class." As the Supreme Court has noted, "even a single common question will do." *Dukes*, 564 U.S. at 359 (internal quotations and alterations omitted). In class actions seeking monetary damages, like this one, those common questions must "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The question of commonality and predominance overlap in ways that make them difficult to analyze separately." *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 374 (7th Cir. 2015). Thus, we address them together here.

A common question is one that is "capable of class-wide resolution" such "that determining the truth or falsity of the common contention will resolve an issue that is central to the validity of each claim." *Id.* (citing *Dukes*, 564 U.S. at 350). Those common questions predominate over any remaining individual questions "if a failure of proof on the common question[s] would end the case and the whole class will prevail or fail in unison." *Id.* at 378 (citing *Amgen Inc. v. Connecticut Ret. Plans and Tr. Funds*, 133 S. Ct. 1184, 1191 (2013)). "What matters to class certification . . . [is] the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (quotation marks omitted). "[T]he critical point is the need for *conduct* common to members of the class." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (quotation marks omitted) (finding commonality satisfied where all class members' claims were derived from the same conduct—the deceptive marketing and packaging of coffee pods). When "the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members," class treatment is appropriate. *Id.* Given this inquiry, assessment of commonality and predominance begins with the elements of the underlying claims for relief. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012). Here, there is no doubt that Standard Innovation at all times acted consistently towards the two classes, and this common conduct gives rise to "the same kind of claims" for both making common questions predominate over individual ones.

1. ***Common Questions Predominate with Respect to the App Class.***

With respect to every member of the proposed App Class, all of the factual and legal questions at issue rely entirely on the design and interaction of the We-Connect application and We-Vibe product, as well as uniform disclosures about those facts. The factual and legal

questions at issue include, amongst others, whether: (i) through We-Connect, Standard Innovation monitored, intercepted, and transmitted the content of electronic communications of App Class members; (ii) Standard Innovation intentionally used or endeavored to use the contents of these communications, while knowing or having reason to know that the data was obtained through the interception of an electronic communication; (iii) App Class members consented to Standard Innovation's interception or use of the contents of these electronic communications; and (iv) Standard Innovation's conduct intruded upon the seclusion of the App Class members' private affairs.

In cases where, as here, a plaintiff asserts Wiretap Act and corresponding state law claims based on "a single system of recording"—such as a telephone recording or, here, Defendant's act of uniformly monitoring its customers' We-Vibe usage communications—common questions will invariably predominate. *See Burrow v. Sybaris Clubs Int'l, Inc.*, No. 13 C 2342, 2015 WL 1887930, at *2 (N.D. Ill. Apr. 24, 2015) (certifying Rule 23(b)(3) class based on "romantic getaway" resort operator's "single system of [telephone call] recording that allegedly violates federal and state wiretap laws"); *see also Harris v. comScore, Inc.*, 292 F.R.D. 579, 581 (N.D. Ill 2013) (certifying Rule 23(b)(3) class on Wiretap Act claims based on data miner's software "which, if installed on a computer, constantly collects data about the activity on the computer and sends it back to [the data miner's] servers."). Further, and as Judge Leinenweber observed in *Burrow*, any consent defense raised by Standard Innovation will also turn on identical evidence—namely, whether Defendant adequately disclosed its data collection practices through terms of use of a privacy policy agreed to by customers. 2015 WL 1887930, at *4. At best, then, a consent defense will only generate additional common questions for each class member, including whether Standard Innovation's data collection practices *violated* the scope of any such

13

terms. *See comScore*, 292 F.R.D. at 585-86 (discussing common questions generated by the defendant's "consent" defense under the Wiretap Act and noting that the "scope of the plaintiffs' consent here is determined by [an] identical process . . . and is therefore common across the [c]lass[.]"). Common questions therefore predominate with respect to the App Class.

### 2. *Common Questions Predominate with Respect to the Purchaser Class.*

These same considerations are true with respect to the Purchaser Class Members' claims—all of the factual and legal questions at issues rely entirely on Standard Innovation's uniform advertising of the We-Vibe product, including whether: (i) members of the Purchaser Class conferred a monetary benefit on Standard Innovation when they purchased We-Vibe products; (ii) Standard Innovation was unjustly enriched by selling products to the Purchaser Class without informing them that We-Connect app was programmed to secretly monitor, collect, and transmit usage information about its users without their knowledge or consent; (iii) the Purchaser class was harmed by Defendant's failure to adequately disclose such usage information; and whether (iv) Defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

Because these common questions are based on Standard Innovation's uniform conduct—namely, its unlawful retention of a benefit relating to its failure to adequately disclose information about its information collection practices to the Purchaser Class—they also predominate. *See e.g. Suchanek*, 764 F.3d at 756 (noting, in case asserting claims for unjust enrichment, that "[w]here the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question" given that "the plaintiffs' claims and those of the class they would like to represent all derive from a single course of conduct") (internal citations omitted); *Lauber v. Belford High Sch.*, No. 09-CV-14345,

2012 WL 5822243, at *2 (E.D. Mich. Jan. 23, 2012) (noting, in a case asserting claims for unjust enrichment, that because "the [Defendant's] conduct is materially uniform among the purported victims . . . all are premised on the allegedly sham accreditation and illegitimacy of [defendant] . . . [defendant's] standardized conduct is an issue common to all members of the purported class").

Accordingly, for each settlement class common questions predominate in satisfaction of Rule 23(a)(2) and (b)(3).

### C. P.S.'s Claims are Typical of those of the Purchaser Class Members' Claims and N.P.'s Claims are Typical of those of the App Members' Claims

Rule 23(a)'s typicality requirement is satisfied when the named plaintiff's claims or defenses "are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement is closely related to commonality, *see Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (citation omitted), and is satisfied when the plaintiff's claims arise from the defendant's same practice or course of conduct and are premised on the same legal theory as the class members' claims. *Id*.; *see also In re AT & T*, 270 F.R.D. at 342. The typicality requirement is viewed permissively, and is satisfied as long as the plaintiff's claims have the "same essential characteristics" as the class's. *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009).

Here, while the named plaintiffs' claims need only have the "same essential characteristics," *see id.*, to those in the class each represents, N.P. and P.S. bring claims that are essentially identical to the other members of the App Class and Purchaser Class, respectively. That is, N.P.'s claims arise out of Defendant's conduct of intercepting her electronic communications once she downloaded the We-Connect application and used it to control her We-Vibe device—an identical position to all members in the App Class. Similarly, P.S.'s claim arises from Defendant's failure to disclose its practice of collecting sensitive information from

15

users of its Bluetooth-enabled devices—a device that P.S. and every member of the Purchaser Class would not have purchased (or would have paid less for) had they known the truth.

Because Plaintiffs' claims and those of the respective classes they seek to represent arise out of substantively identical conduct, Plaintiffs have shown more than "enough for Rule 23(a)(3) purposes." *In re AT & T*, 270 F.R.D. at 342 (citation omitted).

### D. Plaintiffs and Class Counsel Will Adequately Represent the Interests of Both Settlement Classes

Finally, Rule 23(a) requires adequacy of representation, meaning "the representative parties will fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4); *Otero v. Dart*, 306 F.R.D. 197, 206 (N.D. Ill. 2014). There are two components to the adequacy inquiry: "(1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011), *as modified* (Sept. 22, 2011). First, courts must determine whether the class representatives' interests in the outcome of the case coincide with—and lack potential conflicts of interest with—those of the absent class members. *See In re AT & T*, 270 F.R.D. at 343. Second, when assessing class counsel, courts consider their experience litigating similar actions and dedication of time and resources to the particular case at hand. *Id*. at 344.

Here, both N.P. and P.S., as proposed Class Representatives, and Edelson PC, as proposed Class Counsel, will fairly and adequately represent the interests of the proposed settlement classes. First, N.P.'s interest in redressing Defendant's conduct towards those who downloaded the We-Connect application is identical to the interests of all other App Class members: they all suffered the same alleged injury when Standard Innovation intercepted their We-Vibe Usage Information and thus, have the exact same claims. Likewise, P.S.'s interest in

16

redressing Defendant's conduct towards those who purchased a Bluetooth-enabled We-Vibe product is identical to the interest of all other Purchaser Class members, as they all suffered the same alleged injury when Standard Innovation failed to disclose its practice of secretly monitoring and collecting their sensitive usage information and was unjustly enriched in the process.

In addition, Plaintiffs' Counsel are well-respected members of the legal community, who have extensive experience in class actions of similar size, scope, and complexity to the instant action. (Rapp Decl. ¶ 16.) They have regularly engaged in major complex litigation involving consumer technology issues, have the resources necessary to conduct litigation of this nature, and have frequently been appointed lead counsel by courts throughout the country. (*Id.*). Indeed, Plaintiffs' counsel have regularly been found to be adequate representatives by courts nationwide and in this District (including by this Court). *See e.g. Rojas v. Career Educ. Corp.*, No. 10-cv-5260, Dkt. 55 at 3 (N.D. Ill.) (Kendall, J.) (finding that "attorneys at [Edelson PC] are competent and capable of exercising the responsibilities of Class Counsel"); *In re Facebook Privacy Litig.,* No. 10-cv-02389, Dkt. 69 (N.D. Cal. 2010) (appointing Edelson PC Class Counsel and noting that the attorneys at Edelson are "pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on this issue"); *comScore*, 292 F.R.D. at 581 (appointing Edelson PC Class Counsel in case achieving adversarial certification in what is believed to be the largest ever privacy class action).

Accordingly, both Plaintiffs and their counsel have and will continue to adequately represent each Settlement Class, and the final Rule 23(a) requirement is satisfied.

### E.    A class action is the superior method of adjudicating this controversy.

Finally, Rule 23(b)(3) requires that a class action is the superior method of "fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3)(B); *Birchmeier*, 302 F.R.D. at 255; *Subedi v. Merchant*, No. 09-cv-4525, 2010 WL 1978693, at *6 (N.D. Ill. May 17, 2010). Class treatment is particularly well suited for claims resulting from a pattern of standardized conduct because it enables the court to "determine the legality of [an] alleged practice and procedure in one proceeding." *Otero*, 306 F.R.D. at 207; *see also Quiroz v. Revenue Prod. Mgmt., Inc.*, 252 F.R.D. 438, 444 (N.D. Ill. 2008) (citations omitted). Moreover, because the action will now settle, the Court need not consider issues of manageability relating to trial. *See Butler v. Am. Cable & Tel., LLC*, No. 09 CV 5336, 2011 WL 2708399, *6 (N.D. Ill. July 12, 2011) (citing *Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial")).

Here, a class action is the superior method because it allows the Court to swiftly resolve claims regarding We-Vibe's collection and disclosure of its customers' vibrator Usage Information in a single proceeding, generating a uniform result that will apply to all similarly situated persons. By providing swift resolution of common claims in a way that would not be possible individually, the superiority requirement is satisfied. Because the requirements of Rule 23(a) and 23(b)(3) are satisfied, the proposed Settlement class should be certified for settlement purposes.

## V.    PLAINTIFFS' COUNSEL SHOULD BE APPOINTED CLASS COUNSEL

When certifying a class, Rule 23 requires that a court appoint counsel who will "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B), (2), (4); *Harris v.*

*Circuit City Stores, Inc.*, No. 07-cv-2512, 2008 WL 400862, at *11 (N.D. Ill. Feb. 7, 2008) (citation omitted). In appointing class counsel, the court must consider (1) the work counsel has done in identifying or investigating potential claims; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the case; (3) counsel's knowledge of the applicable law, and (4) the resources class counsel has committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv); *Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 498 n.7 (7th Cir. 2013).

      Here, proposed Class Counsel has extensive experience prosecuting similar class actions and other complex litigation, and readily satisfies the criteria of Rule 23(g). As explained above, Edelson PC has been recognized as a pioneer in large digital privacy cases involving complicated technological issues. *See supra*, Section IV.D.; *see also In re Netflix Privacy Litig.*, No 5:11-cv-00379 (N.D. Cal. Aug. 12, 2011) (appointing Edelson PC interim lead counsel, noting that while two other firms had impressive resumes and litigation experience, Edelson PC's "significant and particularly specialized expertise in electronic privacy litigation and class action renders them superior to represent the putative class."); *comScore*, 292 F.R.D. at 581 (appointing Edelson PC Class Counsel in case achieving adversarial certification in what is believed to be the largest ever privacy class action). Edelson PC has also been named a "top national plaintiff's class action firm" in the areas of "technology, privacy, and telecommunications" by the U.S. Chamber Institute for Legal Reform. U.S. Chamber Institute for Legal Reform, *The New Lawsuit Ecosystem: Trends, Targets and Players* at 16 (October 2013) (available at http://www.instituteforlegalreform.com/uploads/sites/1/ The_New_Lawsuit_Ecosystem_pages_web.pdf). Finally, proposed Class Counsel have devoted—and will continue to devote—a significant amount of time, effort and resources to this

litigation, beginning with their initial investigation of Plaintiff's allegations and ending with significant confirmatory discovery, mediations and settlement discussions. (Rapp. Decl. ¶ 16.)

For these reasons, the Court should appoint Eve-Lynn Rapp and Jay Edelson of Edelson PC as Class Counsel.

## VI.     THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL

Rule 23(e) requires judicial approval of a proposed class action settlement based on a finding that the agreement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006). This involves a well-established two-step process. *Armstrong v. Bd. of Sch. Directors of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *In re Northfield Labs., Inc. Sec. Litig.*, No. 06-cv-1493, 2012 WL 366852, at *5 (N.D. Ill. Jan. 31, 2012). The first step—preliminary approval—assesses whether the proposed settlement falls "within the range of possible approval," *see Armstrong*, 616 F.2d at 314, "to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Id.* Once preliminary approval is granted, class members are notified of the settlement, and the court and parties proceed to the second step—the final fairness hearing. *Id.*

Federal courts naturally favor the settlement of class action litigation," *In re AT & T*, 270 F.R.D. at 345 (quoting *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) (internal quotations omitted)), and a multi-factor test is be used to determine whether a proposed settlement is fair, reasonable, and adequate. *Synfuel*, 463 F.3d at 653 (citing *Isby*, 75 F.3d at 1199). At preliminary approval, courts consider the following four factors: (1) the strength of the plaintiff's case compared to the amount of the settlement offer; (2) the length, complexity, and expense of

further litigation; (3) the opinion of competent counsel; and (4) the stage of the proceedings and amount of discovery completed. *See id.* (citing *Isby*, 75 F.3d at 1199).[2] Although these factors are ultimately assessed at the final fairness hearing, a summary version of the analysis takes place at the preliminary approval stage. *Kessler v. Am. Resorts Int'l*, No. 05-cv-5944, 2007 WL 4105204, at *5 (N.D. Ill. Nov. 14, 2007) (citing *Armstrong*, 616 F.2d at 314).[3]

Here, each factor supports the Settlement Agreement, which this Court should find well within the range of possible approval.

### A. The Strength of the Plaintiffs' Case Compared to the Amount of the Settlement Offer Favors Preliminary Approval.

The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of plaintiffs' case on the merits balanced against the amount offered in the settlement." *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 958 (N.D. Ill. 2011) (quoting *Synfuel*, 463 F.3d at 653) (internal quotations omitted). The strength of a plaintiff's case can be quantified by examining "the net expected value of continued litigation to the class" and then estimating "the range of possible outcomes and ascrib[ing] a probability to each point on the range." *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 CV 2898, 2012 WL 651727, at *2 (N.D. Ill. Feb. 28, 2012) (quoting *Synfuel*, 463 F.3d at 653) (internal quotations omitted); *see also Eubank v. Pella Corp.*, 753 F.3d 718 727 (finding that the district court should "estimate the likely outcome of a trial in order to evaluate the adequacy of

---

[2] One additional factor—the amount of opposition to the settlement—is not typically assessed at the preliminary approval stage as notice of the proposed settlement has not yet been administered. *See In re AT & T*, 270 F.R.D. at 349. Accordingly, it is not considered here.

[3] In addition to these factors, the Seventh Circuit has identified several "red flags" that may alert courts to a problematic settlement, including: (1) the failure to establish the total class recovery, (2) the reversion of un-awarded attorneys' fees to the defendant, (3) overly complicated claim forms, and (4) coupon-based relief. *Eubank*, 753 F.3d at 723-26. None of these warning signs are present here, as the Agreement (1) creates two settlement funds, totalling $5 million, (2) with none of that money reverting to Defendant, and (3) with the completion of a short and simple claim form, (4) Class Members will receive real cash relief.

the settlement"). However, "the Seventh Circuit recognizes that a high degree of precision cannot be expected in these calculations" and "[i]nstead courts are to provide a ballpark valuation of the class's claims." *Am. Int'l Grp., Inc.*, 2012 WL 651727, at *2 (internal quotations omitted). "In considering the strength of plaintiffs' case, legal uncertainties at the time of settlement favor approval." *In re Southwest Airlines Voucher Litig.*, No. 11-cv-8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013). Finally, "[b]ecause the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs." *In re AT & T*, 270 F.R.D. at 347 (N.D. Ill. 2010) (quoting *Isby*, 75 F.3d at 1200) (internal quotations omitted). Indeed, "this is especially true when complete victory would most surely bankrupt the prospective judgment debtor." *In re Capital One TCPA Litig.*, 80 F. Supp. 3d 781, 790 (N.D. Ill. 2015). Thus, in terms of tangible monetary relief, the proposed Agreement warrants approval when viewed in light of the risks of a jury trial and potential appeals.

The first factor, an assessment of both the strength of the Plaintiffs' case and the amount offered in settlement, weighs heavily in favor of approval. Sure, complete victory for the Plaintiffs here would exceed $1 billion, but that would bankrupt most companies and would wholly uncollectable from Standard Innovation.[4] The agreement to settle for the $5,000,000 (CAD) maximum of Defendant's insurance policy represents the realistic collectable recovery for the Plaintiffs, even if Plaintiffs succeeded at trial. Based on an estimated 5% claims rate,[5]

---

[4] For the approximately 100,000 members of the App Class, victory on the Wiretap Act claim alone would result a total award of $1,000,000,000 USD ($1,355,500,000 CAD based on the current conversion rate). *See* 18 U.S.C. § 2520(c)(2)(B) (providing for "statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000"). Further, because the entirety of each individual's average $150 purchase is at issue, Standard Innovation also faces an additional $45,000,000 USD ($60,997,500 CAD) in liability for the approximately 300,000 members of the Purchaser Class.

[5] *See e.g.*, *Forcellati v. Hyland's, Inc.*, No. CV 12-1983-GHK MRWX, 2014 WL 1410264, at *6 (C.D. Cal. Apr. 9, 2014) (quoting *Ferrington v. McAfee, Inc.*, No. 10–CV–01455 2012 WL 1156399, at *4 (N.D. Cal. Apr. 6, 2012)) (recognizing that "[t]he prevailing rule of thumb with respect to consumer class actions is [a claims rate of] 3-5 percent"); *Gascho v. Global Fitness Holdings,*

claiming App Class members are estimated to receive approximately $500 and claiming

Purchaser Class members are estimated $40 (20%-45% of the entire purchase price of their We-

Vibe product).

This is an exceptional recovery. To start, it is common for class action settlements in the

privacy space to provide *no monetary relief* to class members at all. For example, a high profile

privacy case against Facebook resolved the claims of *tens (if not hundreds) of millions* of

Facebook users under both the Electronic Communications Privacy Act (which also provides for

$10,000 in statutory damages) and the Video Protection Privacy Act ($2,500 in statutory

damages), in exchange for the creation of a $9.5 million *cy pres*-only fund (*i.e.*, pennies per class

member—paid indirectly). *See Lane v. Facebook, Inc.*, 696 F.3d 811, 820-22 (9th Cir. 2012).

Similarly, Google settled the privacy claims of *tens (if not hundreds) of millions* of Gmail users

under both the Electronic Communications Privacy Act (providing for $10,000 in statutory

damages) and the Stored Communications Act ($1,000 in statutory damages) in exchange for an

$8.5 million *cy pres*–only fund (again, pennies per class member – paid indirectly). *See In re

Google Buzz Privacy Litig.*, No. C 10-00672 JW, 2011 WL 7460099, at *3-5 (N.D. Cal. June 2,

2011).

Even when compared to the handful of recent settlements reflecting a new trend of class

members receiving substantial cash payments in exchange for resolving privacy claims, this

Agreement excels. *See e.g. Kinder v. Meredith*, No. 1:14-cv-11284-TLL-CEB, Dkt. 81 (E.D.

Mich. May 18, 2016) (claiming class members resolved their claims under Michigan's Video

Rental Privacy Act ("VRPA") for approximately $50, or 1% of the $5,000 in provided statutory

---

*LLC*, 2014 WL 1350509, at *30 (S.D. Ohio Apr. 4, 2014) (accepting expert testimony "that response rates
in class actions generally range from one to 12 percent with a median response rate, and a normal
consumer response rate, of approximately five to eight percent"); *Tait v. BSH Home Appliances Corp.*,
No. SACV100711DOCANX, 2015 WL 4537463, at *8 (C.D. Cal. July 27, 2015) (granting final approval
where "claims rate somewhat about 3% was likely a realistic possibility").

damages); *Halaburda v. Bauer Publ'g Co.*, No. 12-cv-12831, Dkt. 68 (E.D. Mich. Jan 6. 2015) (claiming class members under the VRPA for $75); *see also In re Carrier IQ, Inc. Consumer Privacy Litig.*, No. 12-md-02330-EMC, Dkt. 481 (granting final approval to Wiretap Act settlement providing $9 million fund for 30 million class members resulting in approximately $140 to claimants).

In terms of the strength of the case, Plaintiffs believe they will likely succeed on the merits. Nevertheless, Standard Innovation's claimed defenses, including that the Federal Wiretap Act is inapplicable to its actions and that proposed class members consented to their usage information being monitored and collected, pose serious risks to the litigation and would be hotly contested issues every step of the way. This is especially true in light of the fact that N.P.'s claim under the Federal Wiretap Act is a creative application of the statute, and would require the Court to apply it to a unique product. Specifically, to prevail under the Wiretap Act, Plaintiff must prove (i) that Standard Innovation's acquisition of user data constitutes an "interception," and (ii) that the data intercepted constitutes the "contents" of communications. *See* 18 U.S.C.A. § 2520(a). Both prongs present obstacles.

Of particular concern, Plaintiff will have to successfully argue that We-Vibe's "operational instructions"—i.e., the intercepted data, such as a users' desired vibration intensity level and desired vibration mode or pattern—is the "content" of users' communications. To do so, Plaintiff must show that the information transmitted from her device can be distinguished from "non-content dialing, routing, addressing, or signaling information"—information used to route a communication—which courts have determined falls outside the definition of content itself. *See, e.g.*, *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 935 (N.D. Cal. 2015) (describing "referrer headers" as routing information); *but see In re Google Inc. Cookie*

*Placement Consumer Privacy Litig.*, 806 F.3d 125, 139 (3d Cir. 2015), *cert. denied sub nom. Gourley v. Google, Inc.*, 137 S. Ct. 36, 196 L. Ed. 2d 26 (2016) (holding that some "queried URLs" which often serve as routing information can "qualify as content"). The scope of this definition is necessarily uncertain, particularly because its application to We-Vibe's products presents unique and novel technical questions. While Plaintiff remains confident she will prevail because the "federal wiretap statute[] broadly define[s] 'contents,'" *Nix v. O'Malley*, 160 F.3d 343, 346 n. 3 (6th Cir. 1998), and the data at issue closely resembles a uniform record locator (URL), which courts have determined is "content," certain information associated with a We-Vibe users' desired vibration intensity level and desired mode can also be characterized as routing information (i.e. IP address and certain header data). Ultimately, however, because there is no certainty how a jury will parse these technical distinctions at trial, Plaintiff's victory is far from guaranteed.

Plaintiffs will also have to contend with We-Vibe's anticipated defense that its disclosures—made through a Privacy Policy—sufficiently notified users of its information-collection practices, and that plaintiffs therefore consented to its actions. While Plaintiffs will argue that these disclosures were woefully deficient (i.e. Standard Innovation disclosed that personally-identifiable information is *only* collected "if [the user] contacts [We-Vibe]" (*emphasis added*), We-Vibe's disclosure that "certain other information" is automatically gathered and stored, along with the ambiguity of terms such as "personally identifiable information," injects significant uncertainty into Plaintiffs' position.

Considering the significant monetary relief and the strength of Plaintiffs' case, especially when compared to historical privacy class actions, the first element of the test favors a finding that this settlement is "fair, reasonable, and adequate." *See Schulte v. Fifth Third Bank*, No. 09-

25

CV-6655, 2010 WL 8816289, at *3 (N.D. Ill. Sept. 10, 2010) (recognizing that where a "settlement appears relatively generous when compared to settlements in analogous circumstances[, it] is sufficient to satisfy the standard for *preliminary* approval") (emphasis in original). The first—and most important—*Synfuel* factor therefore strongly supports approving the settlement.

**B.      The Potential Length, Complexity, and Expense of Further Litigation Favor Preliminary Approval.**

Preliminary approval is also favored in cases such as this one, where "[s]ettlement allows the class to avoid the inherent complexity, time, and cost associated with continued litigation." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011). Plaintiffs believe that they would have prevailed at trial, but they are also certain that any judgment would have been appealed. Here, should litigation proceed, significant technical discovery will be needed, which will significantly drive up the cost of the litigation. *See In re AT & T Sales Tax Litig.*, 789 F. Supp. 2d at 964 (noting that "costs associated with discovery in complex class actions can be significant"). If anything, "this drawn-out, complex, and costly litigation process . . . would provide [Settlement] Class Members with either no in-court recovery or some recovery many years from now . . . ." *Id*. Further, any such continued litigation will not change the amount of coverage provided by Defendant's insurance policy. Because the proposed Agreement offers immediate monetary relief to the classes, as well as a prompt end to Defendant's alleged conduct, while avoiding the need for extensive and drawn-out litigation, preliminary approval is appropriate.

**C.      The Opinion of Competent Counsel Supports Preliminary Approval.**

The third factor examines the opinion of competent counsel as to whether a proposed settlement is fair, reasonable, and adequate. *Isby*, 75 F.3d at 1200. In assessing the qualifications

of class counsel under this factor, a court may rely upon affidavits submitted by class counsel as well as its own observations of class counsel during the litigation. *Id.*

As noted above, proposed Class Counsel's law firm has extensive experience litigating and settling class actions and other complex litigation of similar size and scope. (Rapp Decl. ¶ 16.) Based on its experience and for the reasons already explained, Class Counsel believe that the Agreement is fair, reasonable, adequate and deserving of preliminary approval. (*Id.* ¶¶ 17, 18.) As Class Counsel believes that the Settlement provides significant relief for individuals who may otherwise be left without a remedy (*Id.* ¶ 18), this factor weighs in favor of preliminary approval as well.

> **D.     The Stage of the Proceedings and the Amount of Discovery Completed Support Preliminary Approval.**

Finally, the last factor concerns the stage of the proceedings and amount of discovery completed at the time the settlement is reached. *Synfuel*, 463 F.3d at 653. This factor is significant because "it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Am. Int'l. Grp.*, 2011 WL 3290302, at *8 (citing *Armstrong,* 616 F.2d at 325). It is well recognized that the court and parties may be equipped with sufficient information even when no formal discovery has taken place if the parties have engaged in considerable informal discovery. *In re AT & T Sales Tax Litig.*, 789 F. Supp. 2d at 966; *Am. Int'l. Grp.*, 2011 WL 3290302, at *8.

Before this Agreement was reached, counsel for the Parties engaged in several months of informal discovery and arms' length discussions, including an in person meeting in Chicago on October 20, 2016. (Rapp. Decl. ¶ 5.) With progress from that meeting, the Parties re-entered arms' length discussions, and after completing sufficient discovery, ultimately agreed to attempt to resolve the matter through private mediation with Judge Denlow. (*Id.* ¶ 6.) On November 22,

2016, after a full day of mediation, the Parties were able to reach an agreement as to the principal terms of the Agreement, after which time Defendant provided Class Counsel confirmatory information on various issues. (*Id.* ¶¶ 8, 10.) Ultimately, because the Parties had more than sufficient information to make knowledgeable decisions about the Settlement throughout the negotiations, the final factor also shows that the Agreement is "fair, reasonable, and just."

## VII. THE PROPOSED METHOD OF NOTICE SHOULD BE APPROVED

When a certified class action is settled, due process and Rule 23 require that the court "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1); *accord In re Sears, Roebuck & Co. Front-loading Washer Prod. Liab. Litig.*, No. 06 C 7023, 2016 WL 772785, at *7 (N.D. Ill. Feb. 29, 2016) (requiring "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort" when approving a settlement of a certified class action) (citation and internal quotations omitted); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974) (explaining that "[i]ndividual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort"). Similarly, Rule 23(e)(1) calls for notice to be provided in a "reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1); *In re Northfield*, 2012 WL 366852, at *7. The notice must contain specific information in plain, easily understood language, including the nature of the action and the rights of class members. Fed. R. Civ. P. 23(c)(2)(B)(i)–(vii); *see In re AT & T*, 270 F.R.D. at 352.

Here, the Agreement contemplates a comprehensive multi-part Notice Plan that ensures notice will be effectuated to at least 70% of class members, while remaining mindful of We-Vibe products' sensitive nature. (*See* Declaration of Jeanne C. Finegan, attached as Exhibit 4 at ¶ 19.)

The notices are likewise written in plain, easily understood language, and provide an explanation of the nature of the action and the rights of class members. (*Id.* ¶ 24.)

First, Defendant will provide the Settlement Administrator a list of all email addresses in Defendant's records that are determined to be associated with potential members of the Purchaser Class and App Class. (Ex. 1, Agreement ¶ 4.2(a).) Once provided, the Settlement Administrator will send direct notice via email along with an electronic link to the Settlement Website, to all settlement class members for whom it has a valid email address. (*Id.* ¶ (4.2(c); Settlement Agreement, Ex. C (Email Notice).) Direct Notice will also be accomplished through the We-Connect Application itself (*Id.* ¶ (4.2(b); Settlement Agreement, Ex. B (App Notice).) That is, by the Notice Date, Defendant will include a new entry in the menu of the We-Connect Application titled "US Class Action Settlement" for App users who Defendant has determined are accessing the We-Connect Application within the United States. This menu option will be displayed until the Claims Deadline, and will (i) inform those who select that menu option that there is a settlement of a class action lawsuit against Defendant, and (ii) provide a brief description of the case and the settlement and a link to the Settlement Website. (*Id.*)

Plaintiffs will supplement the direct notice with publication notice by placing a summary publication notice in leading consumer magazines and on Internet banners. (*Id.* ¶ (4.2(e), (f); Settlement Agreement, Ex. E (Publication Notice) and Ex. F (Internet Banner Ad Notice).) Specifically, in regards to the print publication notice, a one-time half of a page summary publication notice will be placed in People Magazine and Sports Illustrated. (*Id.* ¶ 4.2(e).) Additionally, targeted Internet banner ads will appear on high quality websites such as Google, YouTube, Facebook, Instagram, and Twitter. (*Id.* ¶ 4.2(f).) These ads will run for one month and contain active hyperlinks to the Settlement Website. Moreover, the Agreement also provides for

29

Internet Notice (at www.SICclassactionsettlement.com) (*Id*. ¶ 4.2(d); Settlement Agreement, Ex. D (Long Form Internet Notice).) The summary notice will also be issued to news outlets and journalists over PR Newswire's US1 National distribution.

Finally, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and no later than ten days after filing the Agreement with the Court, Defendant will cause to be served notice of the Agreement upon the Attorney General of the United States, the Attorneys General of each state, and any other required government officials. (Agreement ¶ 4.4(f).)

Because the proposed notice plan effectuates direct notice to all class members identified by Defendant's records, reaches other potential class members through publication notice and the Settlement Website, and fully apprises class members of their rights, it comports with the requirements of due process and Rule 23 and should be approved.

## VIII.  CONCLUSION

For the reasons addressed above, Plaintiffs respectfully request that the Court enter an order, (1) certifying the proposed settlement classes for settlement purposes, (2) naming Plaintiffs as Class Representatives, (3) appointing Jay Edelson and Eve-Lynn Rapp of Edelson PC as Class Counsel, (4) granting preliminary approval of the Settlement, (5) approving the proposed notice plan (6) scheduling a final fairness hearing, and (7) providing such other and further relief as the Court deems reasonable and just.

For convenience, proposed dates and deadlines leading to a final approval hearing are provided in the Proposed Order separately submitted to the Court.

Respectfully submitted,

Dated:  March 9, 2017                   N.P. AND P.S., individually and on behalf of all others similarly situated,

30

By: /s/ Eve-Lynn J. Rapp
One of Plaintiffs' Attorneys

Jay Edelson
jedelson@edelson.com
Benjamin Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Eve-Lynn J. Rapp
erapp@edelson.com
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.234.5262
Fax: 415.373.9435

*Counsel for Plaintiffs and the Putative Classes*

<u>**CERTIFICATE OF SERVICE**</u>

I, Eve-Lynn J. Rapp an attorney, hereby certify that on March 9, 2017, I served the above and foregoing ***Plaintiffs' and the Classes' Motion for Preliminary Approval*** by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

/s/ Eve-Lynn J. Rapp