# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| N.P. and P.S., individually and on behalf of all others similarly situated, | Case No. 1:16-cv-8655 |
| *Plaintiffs,* | Honorable Virginia M. Kendall |
| *v.* | |
| STANDARD INNOVATION CORP., d/b/a WE-VIBE, a Canadian corporation, | |
| *Defendant.* | |

## PLAINTIFFS' MOTION FOR AND MEMORANDUM OF LAW IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## TABLE OF CONTENTS

I.     **INTRODUCTION**................................................................................................1

II.    **BACKGROUND** ...............................................................................................2

    A.    **Nature Of The Litigation**.................................................................2

    B.    **History Of The Proceedings** ...........................................................5

III.    **TERMS OF THE SETTLEMENT** ...............................................................6

    A.    **Class Definitions** .............................................................................6

    B.    **Monetary Relief** ..............................................................................7

        1.    *Relief to App Class Members* ...................................................7

        2.    *Relief to Purchase Class Members* ..........................................7

    C.    **Prospective Relief** ...........................................................................8

    D.    **Additional Terms** ............................................................................8

        1.    *Payment of Notice and Settlement Administration Expenses*......8

        2.    *Payment of Incentive Award and Attorneys' Fees* .....................9

    E.    **Release Of Liability** ........................................................................9

IV.    **THE BEST NOTICE PRACTICABLE HAS BEEN PROVIDED TO CLASS MEMBERS** ...........................................................9

V.    **THE SETTLEMENT WARRANTS FINAL APPROVAL**.......................13

    A.    **The Strength Of Plaintiffs' Case Compared To The Settlement Weighs In Favor Of Granting Final Approval**................................14

    B.    **The Likely Complexity, Length, And Expense Of Continued Litigation Weighs In Favor Of Final Approval Of The Settlement** ...............................................................18

    C.    **The Reaction Of The Settlement Classes Favor Final Approval**...................18

    D.    **Experienced Counsel's Belief That The Settlement Is Beneficial To The Class Weighs In Favor Of Final Approval** ...........................................19

**E.** **The Stage Of The Proceedings And Amount Of Discovery Completed Weigh In Favor Of Final Approval.** ...............................................20

**F.** **The Settlement Raises No Red Flags** ..................................................21

**VI.** **CONCLUSION** ..............................................................................................22

## TABLE OF AUTHORITIES

**Supreme Court Cases**

*Eisen v. Carlisle & Jacquelin*,
　　417 U.S. 156 (1974).................................................................................................9, 10

**United States Court of Appeals Cases**

*Armstrong v. Bd. of Sch. Dirs*
　　616 F.2d 305 (7th Cir. 1980) ...............................................................................20

*Carnegie v. Household Int'l, Inc.*,
　　376 F.3d 656 (7th Cir. 2004) ...............................................................................16

*Eubank v. Pella Corp.*,
　　753 F.3d 718 (7th Cir. 2014) ...........................................................................14, 21

*Felzen v. Andreas*,
　　134 F.3d 873 (7th Cir. 1998) ...............................................................................19

*Hughes v. Kore of Ind. Enter., Inc.*,
　　731 F.3d 672 (7th Cir. 2013) ...........................................................................10, 13

*Isby v. Bayh*,
　　75 F.3d 1191 (7th Cir. 1996) ...............................................................................13

*Lane v. Facebook, Inc.*,
　　696 F.3d 811 (9th Cir. 2012) ...............................................................................17

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*,
　　834 F.2d 677 (7th Cir. 1987) ...............................................................................21

*Mullins v. Direct Digital, LLC*,
　　795 F.3d 654 (7th Cir. 2015) .......................................................................10, 12, 13

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
　　463 F.3d 646 (7th Cir. 2006) ................................................................... *passim*

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*,
　　309 F.3d 978 (7th Cir. 2002) ...............................................................................13

## United States District Court Cases

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
    No. 07-2898, 2012 WL 651727 (N.D. Ill. Feb. 28 2012) ......................................13, 14, 18

*Aranda v. Caribbean Cruise Line, Inc.*,
    No. 12-4069, 2017 WL 818854 (N.D. Ill. Mar. 2, 2017) ..................................................13

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
    789 F. Supp. 2d 935 (N.D. Ill. 2011) ............................................................14, 18, 19, 20

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
    270 F.R.D. 330 (N.D. Ill. 2010) ....................................................................................15

*In re Facebook Privacy Litig.*
    No. 10-2389, Dkt. 69 (N.D. Cal. 2010) ..........................................................................19

*In re Google Buzz Privacy Litig.*,
    No. 10-0672, 2011 WL 7460099 (N.D. Cal. June 2, 2011)...............................................17

*In re Mexico Money Transfer Litig.*,
    164 F. Supp. 2d 1002 (N.D. Ill. 2000) ......................................................................18, 20

*In re Southwest Airlines Voucher Litig.*,
    No. 11-8176, 2013 WL 4510197 (N.D. Ill. Aug. 26, 2013) ........................................14, 15

*Kinder v. Meredith*,
    No. 14-11284, Dkt. 79, 81 (E.D. Mich. May 18, 2016)....................................................17

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP*,
    No. 97-7694, 2001 WL 1568856 (N.D. Ill. Dec. 10, 2001)...............................................19

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011)........................................................................ *passim*

## Statutory Authority

18 U.S.C. § 2510................................................................................................................5

18 U.S.C. § 2520................................................................................................................17

Fed. R. Civ. P. 23 .................................................................................................9, 10, 12, 13

**Other Authority**

Domonske, Camila, *Vibrator Maker To Pay Millions Over
Claims It Secretly Tracked Use,*
 npr (Mar. 14, 2017, 1:52 PM) ........................................................................12

*Edelson Credit In-House Forensics Lab for Its Success in
Data Security and Privacy Litigation,*
 American Lawyer (July 12, 2017) ...............................................................20

Johnson, Tim, *New internet outrage: 'Smart' sex toy
sent company details of its use,*
 Miami Herald (Dec. 14, 2016, 8:00 AM) .......................................................12

*Judges' Class Action Notice and Claims Process Checklist
and Plain Language Guide* at 3 (2010),
 www.fjc.gov/sites/default/files/2012/NotCheck.pdf ......................................10

Roberts, Jeff John, *Sex Toy Maker Pays $3.75 Million to
Settle 'Smart' Vibrator Lawsuit,*
 Fortune (Mar. 10, 2017) ..............................................................................12

Storey, Kate, *A Vibrator Company Has to Pay Millions to
Customers for Secretly Tracking Their Sexual Activity,*
 Cosmopolitan (Mar. 14, 2017) ....................................................................12

Quinn, Rob, *'Smart vibrator' maker settles suit from outraged users*,
 Fox News (Mar. 13, 2017) ............................................................................12

Zumbach, Lauren *Maker of app-linked personal massage
device settles privacy lawsuit for $3.75 million,*
 Chicago Tribune (Mar. 13, 2017, 4:00 PM) ................................................12

## I.    INTRODUCTION

On March 14, 2017, this Court preliminarily approved a class action settlement (the "Settlement") reached between Plaintiffs N.P. and P.S. ("Plaintiffs") and Defendant Standard Innovation Corp. ("Standard Innovation" or "Defendant"). (Dkt. 33.) The Settlement resolves claims arising out of Defendant's alleged collection of personal information about customers' use of its "We-Vibe" line of adult sex toys (vibrators). The Settlement—reached after extensive arms' length negotiations with the assistance of the Honorable Morton Denlow (ret.) of JAMS Chicago—creates two non-reversionary funds totaling $5,000,000 Canadian dollars ("CAD") that will be used to pay claims of consumers who purchased a We-Vibe product (the "Purchaser Class") and/or downloaded and used a related smartphone app in conjunction with a We-Vibe product (the "App Class"). Members of each class will each receive around $24 and $103 (in US currency) respectively, amounts that compare favorably both to the expected value of continued litigation as well as to other approved settlements.[1] The Settlement also requires Standard Innovation to destroy data it has collected, alter its privacy policy, and implement certain protocols to ensure that its privacy practices remain consistent with its disclosures to consumers.

That the Settlement provides exceptional relief for class members is confirmed by their reaction to the Settlement. Claims rates have been well above average for class action settlements, and despite a robust Court-approved notice plan (and extensive media coverage), not a single class member has objected to the Settlement, and only one has opted out.

For these reasons, and as discussed more fully below, the Settlement is fair, reasonable,

---

[1]    While these individual payment amounts are less than the estimated amounts provided at preliminary approval (Dkt. 27 at 22-23), this is due to class members' overwhelmingly positive response to the Settlement, which resulted in claims rates of around 6.5% for the Purchaser Class and over 15% for the App Class, which exceed the typical 5% claims rate (i.e. the rate used for payout estimates at preliminary approval).

and adequate, and satisfies all the prerequisites for final approval under Rule 23. Consequently, this Court should have no hesitation in granting final approval to the Settlement.

## II.     BACKGROUND

The background of this case and the Settlement has been fully set forth in Plaintiffs' Motion and Memorandum in Support of Preliminary Approval of Class Action Settlement (Dkt. 27) and Plaintiffs' Motion and Memorandum in Support of Attorneys' Fees, Expenses and Incentive Awards. (Dkt. 36.) Nevertheless, for the convenience of this Court, Plaintiffs repeat that background here.

### A.     Nature Of The Litigation.

Standard Innovation markets, sells, and supports a line of vibrators under the "We-Vibe" product label. The We-Vibe's principle selling point is that users can control the device—e.g., by adjusting its intensity and vibration patterns—via a smartphone. (Dkt. 26 at ¶¶ 20, 21.) To access these functions, customers must download Standard Innovation's We-Connect application ("We-Connect" or the "App"), which allows users to "pair" a specific We-Vibe to a smartphone via a Bluetooth connection. (*Id.* ¶ 13.) The App also allows different We-Connect users to communicate with each other. (*Id.* ¶ 14.) For example, through We-Connect's "connect lover" feature, users can send messages, engage in video chats, and remotely control their partner's We-Vibe device in real time. (*Id.*) All of these features are central to the We-Vibe product. (*Id.* ¶¶ 18, 19.)

While the We-Vibe device gives users a unique way to intimately communicate and interact, Plaintiffs allege that Standard Innovation also programmed the We-Connect App — without its customers' knowledge or consent—to collect a substantial amount of information about its customers' usage habits. (*Id.* ¶ 20.) For example, Plaintiffs claim that Standard

Innovation programmed the App to (i) monitor and record how its customers use their devices in real time (i.e., by continuously and contemporaneously intercepting and monitoring electronic communications between a user's smartphone and the We-Vibe device), and (ii) collect and transmit this data to Standard Innovation servers in Canada. (*Id*. ¶¶ 2, 21, 22.) The information collected allegedly included: the date and time of each use, the vibration intensity level selected by the user, the vibration mode or pattern selected by the user and, where available, the email address of customers who registered with We-Connect. (*Id*. ¶ 20.) Standard Innovation also allegedly collected information through We-Connect's "connect lover" feature (e.g., data related to the connected We-Vibe device, including its temperature and battery life). (*Id*. ¶ 23.) And again, as this information was collected, it was transmitted to Standard Innovation's servers in Canada. (*Id*. ¶ 2.)

Needless to say, the usage information collected by Standard Innovation through We-Connect was extraordinarily intimate and private. That users might consider this information highly sensitive and threatening to their privacy is a fact that has been recognized (and anticipated) by Standard Innovation itself: rather than inform customers about its allegedly intrusive collection practices—which Plaintiffs claim operated without customers' knowledge or consent—the We-Connect App assured users that the application was "secure" and could initiate "a secure connection between . . . smartphones." (*Id*. ¶ 14, 23.) Notwithstanding these representations of security and confidentiality, Plaintiffs alleged that Standard Innovation collected individual-level usage information—often tied to users' personally identifiable email addresses—and as a result, Standard Innovation breached its customers' trust, devalued their purchases (given that few, if any, consumers would knowingly purchase a vibrator that was subject to constant surveillance), and violated federal and state law in the process. (*Id*. ¶¶ 3, 24.)

Plaintiff N.P. purchased a We-Vibe Rave vibrator from a local retailer for $130 for her own personal use. (*Id*. ¶ 25.) Soon after the purchase, N.P. downloaded We-Connect onto her smartphone and paired it with her We-Vibe. (*Id*. ¶ 27.) She did so in order to access the We-Vibe's full array of features and to control her We-Vibe wirelessly from her smartphone. (*Id*.) Since her purchase of the We-Vibe in May 2016, N.P. has used We-Connect on several occasions. (*Id*. ¶ 28.) N.P. claims that, unbeknownst to her, Defendant programmed We-Connect to secretly intercept, monitor, collect, and transmit her usage information. (*Id*. ¶ 29.) Accordingly, each and every time N.P. used We-Connect to control her We-Vibe, Defendant intercepted and collected her personally identifiable We-Vibe usage information, and transmitted it to its servers in Canada. (*Id*. ¶ 30.) N.P. further alleged that Defendant never informed her that it would monitor, collect, and transmit her usage information and that she never expressly consented to Defendant doing so. (*Id*. ¶¶ 31, 32.) N.P. would never have purchased a We-Vibe had she known that utilizing its full functionality would allow Defendant to monitor, collect, and transmit her usage information through We-Connect. (*Id*. ¶ 33.)

Plaintiff P.S. bought a We-Vibe 4 Plus vibrator from a local retailer for $193. (*Id*. ¶ 34.) The We-Vibe 4 Plus's product packaging—like the product packaging of all Defendant's Bluetooth enabled devices in the We-Vibe line—touted its App-compatibility and Bluetooth functionality (via We-Connect). (*Id*. ¶ 35.) As a result of those features, the purchase price for each the Bluetooth enabled devices in the We-Vibe product line (specifically, the We-Vibe® Classic, We-Vibe® 4 Plus, We-Vibe® 4 Plus App Only, Rave by We-Vibe™ and Nova by We-Vibe™ products), is substantially higher than other comparable vibrators without those features. (*Id*.) Unbeknownst to P.S. at the time of his purchase, Defendant allegedly programmed We-Connect to secretly monitor, collect, and transmit its users' usage information to We-Vibe's

servers. (*Id. ¶ 36.*) Plaintiff P.S. would not have purchased the We-Vibe (or would have paid substantially less) had he known that Defendant would monitor, collect, and transmit usage information about users through the We-Connect app (which users were required to use in order to access the product's full functionality). (*Id. ¶ 37.*)

### B.    History Of The Proceedings.

On September 2, 2016, N.P. filed a putative class action lawsuit against Standard Innovation. (Dkt. 1.) She subsequently filed an amended complaint on February 27, 2017, adding P.S. as an additional named plaintiff. The amended complaint alleged three causes of action for (i) violation of the Federal Wiretap Act, 18 U.S.C. §§ 2510 et seq., (ii) intrusion upon seclusion, and (iii) unjust enrichment. (Dkt. 26 ¶¶ 46, 52, 60.)

Early on, the parties sought a resolution of this matter. (*See* Declaration of Eve-Lynn J. Rapp, Dkt. 27-3 ¶ 4.) As part of their discussions, the parties informally exchanged information related to Defendant's data collection practices, Defendant's privacy policies, the information they disclosed to consumers, the number of class members, available insurance, and Defendant's financial resources. (*Id.*) After the exchange of information, counsel for the parties met in person on October 20, 2016 to discuss substantive issues involved in the case and possible structures for resolution. (*Id. ¶ 5.*) Ultimately, the parties agreed to attempt to resolve the matter through private mediation with the Honorable Morton Denlow (Ret.) of JAMS Chicago, and that Defendant's insurer, Liberty International Underwriters ("Liberty") should be present for those negotiations. (*Id. ¶ 6.*) In the weeks that followed, and in hopes of furthering the negotiations, Plaintiffs also made a policy demand on Liberty. (*Id. ¶ 7.*)

On November 22, 2016, Plaintiffs' counsel, Defendant's counsel, Defendant's corporate representatives, and a representative from Liberty participated in a formal mediation session with

Judge Denlow. (*Id.* ¶ 8.) At the time of their early meeting and since making their policy

demand, Plaintiffs were clear that Standard Innovation would have to change its data collection

practices and, given Defendant's limited financial resources, if any resolution was to occur at an

early stage, Liberty would have to put up the entirety of Standard Innovation's $5 million CAD

insurance policy. (*Id.* ¶ 9.) After several rounds of arms'-length negotiations, the parties were

able to reach an agreement as to the principal terms of the Settlement, which was formalized in a

binding Memorandum of Understanding. (*Id.* ¶ 10.) After that, it took several additional weeks of

discussions and negotiations to hammer out all the details of the Settlement. (*Id.* ¶ 11.)

On March 14, 2017, this Court certified the Purchaser Class and the App Class for

settlement purposes, granted preliminary approval to the Settlement, and directed that notice of

the case and Settlement be disseminated to class members. (Dkt. 33.) The deadline for class

members to opt out of or object to the Settlement has now passed, as has the deadline for class

members to submit claims. The parties and the Court-appointed Settlement Administrator have

fully complied with the preliminary approval order's notice requirements, and now seek final

approval of the Settlement.

## III.    TERMS OF THE SETTLEMENT

The terms of the Settlement preliminarily approved by the court are set forth in the

Settlement Agreement (Dkt. 27-1), and are briefly summarized as follows:

### A.    Class Definitions.

On March 14, 2017, this court certified the following two Settlement Classes:

> **App Class**: All individuals in the United States who downloaded the We-Connect
> application and used it to control a We-Vibe Brand Product before September 26,
> 2016.

> **Purchaser Class**: All individuals in the United States who purchased a Bluetooth
> enabled We-Vibe brand product before September 26, 2016.

6

(Dkt. 33 ¶¶ 3-4.) The settlement classes contain the usual exclusions of the Court, the Mediator, the Settlement Administrator and the Defendant (*id.*), and the covered "We-Vibe Brand Products" are listed in the Settlement Agreement. (Dkt. 27-1 ¶ 1.40).

### B. Monetary Relief.

Standard Innovation agreed to establish two non-reversionary settlement funds totaling $5 million CAD. This money will be divided between the two funds and ultimately distributed to members of the two classes as follows:

1. *Relief to App Class Members*: $4 million CAD will be put into an App Settlement Fund. Each member of the App Class who submits a valid claim will receive a *pro rata* share of the App Settlement Fund after payment of all settlement administration expenses, incentive awards, and fee awards. (Dkt. 27-1 ¶¶ 1.5, 2.2.) As explained below, *infra* Part V.A, members of the App Class submitting valid claims are expected to receive around $103 (US) each.

2. *Relief to Purchase Class Members*: $1 million CAD will be put into a Purchaser Settlement Fund. Each member of the Purchaser Class who submits a valid claim will receive a *pro rata* share of the Purchaser Settlement Fund after payment of all settlement administration expenses, incentive awards, and fee awards. (Dkt. 27-1 ¶¶ 1.32, 2.1.) As explained below, *infra* Part V.A, members of the Purchaser Class submitting valid claims are expected to receive around $24 (US) each.

### C.      Prospective Relief

Standard Innovation has agreed—subject to any legal requirements—to delete all of the following data in its possession: email addresses provided as part of the We-Connect application registration process, the time and date of each device use, the vibration intensity level selected by the user, the vibration mode or pattern selected by the user, the temperature of the device, and the battery life. (Dkt. 27-1 ¶ 2.3(g).)

Going forward, for at least three years Defendant will not include a registration process on the We-Connect App and will not collect email addresses through the We-Connect App (excluding email addresses provided by users specifically to receive the Standard Innovation newsletter or register their product). (*Id.* ¶ 2.3(a).) Additionally, Standard Innovation has already updated its privacy notice about its data collection practices with respect to the We-Connect App and will inform those who have downloaded the App of their data collection practices. (*Id.* ¶ 2.3(d)-(e).) Although it will no longer collect personal user information, to the extent that Defendant uses a third party to collect data in aggregate in non-identifiable form for internal analytics purposes, Defendant will (i) provide notice of this data collection practice in the privacy notice; and (ii) provide App users with a method to opt out of their data being provided to the third party for such purposes. (*Id.* ¶ 2.3(c).)

### D.      Additional Terms.

In addition to the monetary and prospective relief described above, the parties have agreed to the following terms:

1.      *Payment of Notice and Settlement Administration Expenses*: Notice and settlement administration expenses incurred on behalf of the App Class will be paid out of the App Settlement Fund, while any such expenses incurred on behalf of the Purchaser Class will be

paid out of the Purchaser Settlement Fund. Any such expenses incurred on behalf of both the App Class and the Purchaser Class will be paid out of each fund proportionally. (*Id*. ¶ 1.36.)

        2.    *Payment of Incentive Award and Attorneys' Fees*: The parties have agreed that in addition to the relief received as class members under the Settlement, each of the Plaintiffs should receive an incentive award of $5,000 from their respective settlement fund as compensation for their time and effort serving as class representatives on behalf of the settlement classes. (*Id*. ¶¶ 2.1(a), 2.2(a), 8.3.) The parties have also agreed that any attorneys' fees awarded by the Court shall be paid from the two settlement funds, not to exceed one-third of either fund. (*Id*. ¶¶ 2.1(a), 2.2(a), 8.1.) Plaintiffs have petitioned the Court separately for approval of requested incentive and fee awards (Dkt. 36), which was referred to Magistrate Judge Mason. (Dkt. 42.) Copies of both the petition and an order of Judge Mason setting forth the deadline to object to the petition have been posted on the settlement website (described more fully below).

        **E.**    **Release Of Liability.**

        In exchange for the relief described above, Standard Innovation will receive a full release from all claims related to (i) the collection, disclosure, storage, use or misuse of information in connection with a We-Vibe product or the We-Connect app, (ii) the disclosure or non-disclosure of any information practices in connection with a We-Vibe product or the We-Connect app, and (iii) allegations of deceptive conduct related to a We-Vibe product or the We-Connect app. (*See* Dkt. 27-1 ¶¶ 1.33-1.35, for complete release language.)

## IV.    THE BEST NOTICE PRACTICABLE HAS BEEN PROVIDED TO CLASS MEMBERS.

        Prior to granting final approval to this Settlement, the Court must consider whether the class members received "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ.

P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 595 (N.D. Ill. 2011). The "best notice practicable" does not require receipt of actual notice by all class members in order to comport with both Rule 23 and the requirements of due process. Indeed, where class members' contact information cannot be determined with reasonable effort, notice may be effectuated by alternative means such as "paid advertising, and/or posting in places frequented by class members, all without offending due process." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 665 (7th Cir. 2015); *see also Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, 676-77 (7th Cir. 2013) ("Where reasonable effort would not suffice to identify the class members, notice by publication, imperfect though it is, may be substituted."). In general, a notice plan that reaches at least 70% of class members is considered reasonable. *See* Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* at 3 (2010), *available at* www.fjc.gov/sites/default/files/2012/NotCheck.pdf.

This Court approved a notice plan calling for direct notice through email and the We-Connect App, as well as publication notice through advertisements in major national magazines, internet banner advertisements on high-quality websites, and the creation of a settlement website. (Dkt. 33 ¶ 10.) Given the breadth of the notice plan, it is no surprise that this Court found that "in form, method, and content, [it] fully complies with the requirements of Fed. R. Civ. P. 23 and due process, constitutes the best notice practicable under the circumstances, and is due and sufficient notice to all persons entitled thereto." (Dkt. 33 ¶ 10.) The Court also appointed Heffler Claims Group, LLC ("Heffler") as Settlement Administrator to effectuate the notice plan. (*Id.* ¶ 9.)

Heffler and the parties have since diligently executed the notice plan. First, Defendant provided Heffler with a list of email addresses in Defendant's records that they were able to determine—after good faith reasonable effort—are associated with potential members of the two classes. (Finegan Decl. ¶ 16).[2] On May 1, 2017, Heffler sent direct notice of the Settlement to each of the 27,155 email addresses on the list. (*Id.* ¶ 18.) Only 89 emails (or less than .4%) were undeliverable. (*Id.*)

Second, Defendant added a new entry in the menu of the We-Connect App entitled "U.S. Class Action Settlement." (*Id.* ¶ 19.) When a user selects that menu option—which was displayed to U.S. users through the settlement claims deadline—the app provides notice of and information about the Settlement, as well as a link to the settlement website. (*Id.*)

In addition to the direct notice described above, extensive publication notice through various methods has been provided to the class. On March 21, 2017, Heffler launched a case-specific website (www.sicclassactionsettlement.com). (*Id.* ¶ 33.) The settlement website contains information about the case and the Settlement (including exclusion, objection, and claim deadlines), the court-approved notice, answers to frequently asked questions, copies of Plaintiffs' fee petition and other court documents, and contact information for the Settlement Administrator, including a toll-free telephone number. The settlement website also allows class members to submit claims online. The website has been visited over 140,000 times, and over 1,200 calls have been made to the toll-free number. (*Id.* ¶¶ 34, 35.)

Furthermore, print publication notice of the Settlement was made in half page advertisements in *People* magazine and *Sports Illustrated*, both of which have nationwide readership in the tens of millions. (*Id.* ¶¶ 20-23.) Internet banner advertisements were also placed

---

[2] The Declaration of Jeanne C. Finegan Concerning Implementation and Adequacy of Notice Program is attached hereto as Exhibit 1.

on well-known, popular websites such as Google, Facebook, Twitter, and Pinterest. (*Id*. ¶ 24.) The ads were also served across the Google Display Network on over 2,900 other individual websites. (*Id*. ¶ 25.) Internet notice resulted in over 39,500,000 impressions directed to the target audience (i.e., people deemed most likely to be members of the classes). (*Id*. ¶¶ 14, 24.) Finally, though not part of the court-approved notice plan, it is worth pointing out the extensive media coverage that this case and its settlement generated. For example, there have been at least 146 news mentions of the Settlement (*id*. ¶ 30), with stories appearing in national outlets such as *Fortune* and *Cosmopolitan* magazines,[3] National Public Radio,[4] and Fox News;[5] regional outlets such as the *Chicago Tribune*[6] and the *Miami Herald*;[7] and even local television reports.[8] And there has been extensive discussion on Twitter regarding the Settlement, with over 2,800 tweets and retweets from over 2,500 contributors resulting in over 46 million impressions. (*Id*. ¶ 31.)[9]

---

[3]     Jeff John Roberts, *Sex Toy Maker Pays $3.75 Million to Settle 'Smart' Vibrator Lawsuit*, Fortune (Mar. 10, 2017), http://fortune.com/2017/03/10/sex-toy-maker-settlement-smart-vibrator-lawsuit/; Kate Storey, *A Vibrator Company Has to Pay Millions to Customers for Secretly Tracking Their Sexual Activity*, Cosmopolitan (Mar. 14, 2017), http://www.cosmopolitan.com/sex-love/a9130160/we-vibe-vibrator-company-secretly-tracking-users-sexual-activity/.

[4]     Camila Domonske, *Vibrator Maker To Pay Millions Over Claims It Secretly Tracked Use*, npr (Mar. 14, 2017, 1:52 PM), http://www.npr.org/sections/thetwo-way/2017/03/14/520123490/vibrator-maker-to-pay-millions-over-claims-it-secretly-tracked-use.

[5]     Rob Quinn, *'Smart vibrator' maker settles suit from outraged users*, Fox News (Mar. 13, 2017), http://www.foxnews.com/tech/2017/03/13/smart-vibrator-maker-settles-suit-from-outraged-users.html.

[6]     Lauren Zumbach*, Maker of app-linked personal massage device settles privacy lawsuit for $3.75 million*, Chicago Tribune (Mar. 13, 2017, 4:00 PM), http://www.chicagotribune.com/business/ct-we-vibe-privacy-lawsuit-settlement-0314-biz-20170313-story.html.

[7]     Tim Johnson, *New internet outrage: 'Smart' sex toy sent company details of its use*, Miami Herald (Dec. 14, 2016, 8:00 AM).

[8]     *See, e.g.,* Joe Ducey, *Easy money? Settlements mean refunds!*, ABC 15 Arizona (June 15, 2017, 7:07 PM).

[9]     Tellingly, as a result of the media campaign, nearly 13,000 claims were filed ahead of the Court-established Notice Date.

Between the direct email notice to all possible purchasers, the direct in-App notice to all possible App users, and the magazine and internet publication notice (not to mention the widespread media exposure the Settlement garnered), it is clear that Rule 23's notice requirements and due process have been satisfied. *See, e.g., Mullins*, 795 F.3d at 665 (explaining that "paid advertising, and/or posting in places frequented by class members" can satisfy class notice requirements); *Hughes*, 731 F.3d at 677 (finding newspaper publication, website, and physical posting of class action notices in relevant locations sufficient); *Aranda v. Caribbean Cruise Line, Inc.*, No. 12-4069, 2017 WL 818854, *2 (N.D. Ill. Mar. 2, 2017) (finding class notice sufficient where professional settlement administrator attempted direct notice, notice was published in prominent publications nationwide (including *People* magazine) and in online banner ads, hundreds of thousands of people visited settlement website, and thousands of people called toll-free settlement number). Indeed, the publication notice alone is estimated to have reached 76% of class members. (Finegan Decl. ¶ 6.) Because sufficient notice has been provided to the members of the two classes, and for the further reasons explained below, the Court should grant final approval to the Settlement.

## V. THE SETTLEMENT WARRANTS FINAL APPROVAL

Federal Rule of Civil Procedure 23(e) mandates that "claims, issues, or defenses of a certified class may be settled . . . only with the court's approval . . . after a hearing and finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e); *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07-2898, 2012 WL 651727, at *1 (N.D. Ill. Feb. 28 2012). Even so, "[f]ederal courts naturally favor the settlement of class action litigation." *Schulte*, 805 F. Supp. 2d at 578 (citing *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996)). Given this predisposition towards settlement, the Court's approval inquiry "is limited to [consideration of] whether the

proposed settlement is lawful, fair, reasonable and adequate." *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 986 (7th Cir. 2002).

In considering the overall fairness of a settlement, courts consider five factors (sometimes referred to as the *Synfuel* factors): (i) the strength of plaintiff's case compared to the amount of defendant's settlement offer; (ii) an assessment of the likely complexity, length and expense of the litigation; (iii) an evaluation of the amount of opposition to the settlement among affected parties; (iv) the opinion of competent counsel; and (v) the stage of the proceedings and amount of discovery completed at the time of settlement. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (internal citations omitted); *accord In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 958 (N.D. Ill. 2011). Each factor in the instant case weighs in favor of final approval.

### A. The Strength Of Plaintiffs' Case Compared To The Settlement Weighs In Favor Of Granting Final Approval.

"The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of plaintiff['s] case on the merits balanced against the amount offered in the settlement." *In re AT&T Mobility*, 789 F. Supp. 2d at 958 (quoting *Synfuel*, 463 F.3d at 653). The strength of a plaintiff's case can be quantified by examining "the net expected value of continued litigation to the class" and then estimating "the range of possible outcomes and ascrib[ing] a probability to each point on the range." *Am. Int'l Grp., Inc.*, 2012 WL 651727, at *2 (quoting *Synfuel*, 463 F.3d at 653); *see also Eubank v. Pella Corp.*, 753 F.3d 718, 727 (7th Cir. 2014) (finding that the district court should "estimate the likely outcome of a trial in order to evaluate the adequacy of the settlement"). However, "the Seventh Circuit recognizes that a high degree of precision cannot be expected in these calculations" and instructs courts to "[i]nstead . . . provide a ballpark valuation of the class's claims." *Am. Int'l Grp., Inc.*, 2012 WL 651727, at *2

14

(internal quotations omitted). "In considering the strength of plaintiff['s] case, legal uncertainties at the time of settlement favor approval." *In re Southwest Airlines Voucher Litig.*, No. 11-8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013). Furthermore, courts should be mindful "not [to] reject a settlement solely because it does not provide a complete victory to the plaintiffs," given that "[p]arties to a settlement benefit by immediately resolving the litigation and receiving some measure of vindication for their positions while foregoing the opportunity to achieve an unmitigated victory." *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (internal quotations omitted).

Here, when the immediate monetary relief and improved privacy practices are viewed in light of the risks of proceeding all the way through trial, it's clear that the Settlement should be approved. Based on the current claim rate, members of the App Class are expected to receive around $103 (US) each, and members of the Purchaser Class are expected to receive around $24 (US) each.[10] These values compare favorably with what Plaintiffs could expect to recover through continued litigation.

---

[10]    The math is as follows: The App Settlement Fund is $4,000,000 CAD, which at a recent exchange rate of .7975 equals approximately $3,190,000 USD. Total notice and administration expenses allocable to the App Settlement Fund are $264,814.66 USD. (Dkt. 36-2 ¶ 14.) Assuming this Court awards Plaintiffs' proposed full incentive award and fee request with respect to that fund ($5,000 USD incentive award; $911,728.45 USD fee request), there will be $2,008,456.89 USD remaining to distribute to members of the App Class. As of July 20, 2017, 21,487 members of the App Class had submitted claims. (Kealey Decl. ¶ 10.) An estimated 2,067 of these claims are invalid, resulting in *pro rata* payments of over $103 USD to each of the 19,420 valid App Class claims. The math for the Purchaser Settlement Fund is similar. That fund is $1,000,000 CAD, which equals approximately $797,500 USD. Notice and administrative expenses allocable to that fund are $113,442.37 USD. (Dkt. 36-2 ¶ 14.) Subtracting that, as well as Plaintiffs' proposed incentive award and fee request ($5,000 USD and $212,185.88 USD, respectively) leaves $466,871.75 USD to distribute to members of the Purchaser Class. As of July 20, 2017, 21,463 members of the Purchaser Class have filed claims (Kealey Decl. ¶ 10), 2,170 of which are estimated to be invalid, resulting in *pro rata* payments of over $24 USD to each of the 19,293 valid Purchaser Class claims.

As explained in Plaintiffs' preliminary approval brief (Dkt. 27 at 24-25), there are significant hurdles that Plaintiffs would have to overcome before achieving victory through litigation. For example, Plaintiff N.P.'s wiretap claims involve a unique and creative application of the statute presenting difficult questions regarding whether the user data collected qualifies as the "contents" of a communication under the act, and whether Defendant's collection of that data constitutes an "interception." In addition, Defendant would likely argue that it sufficiently disclosed its data collection practices in its Privacy Policy, thus absolving it of liability. Finally, if the parties had not settled and litigation were to continue, Defendant would no doubt contest class certification. And if no class were certified, it is unlikely that class members would recover *anything* because they would have little incentive to file individual suits absent the efficiencies of class proceedings. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The realistic alternative to a class actions is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.") (emphasis omitted).

Furthermore, even if Plaintiffs could obtain a full class recovery at trial, collectability would be a serious issue. Complete victory for Plaintiffs would expose Defendant to liability exceeding $1 billion, which would be wholly uncollectable. (*See* Dkt. 27 at 22.) The likely collectable amount is the $5,000,000 CAD limit of Defendant's insurance policy, which is what this case ultimately settled for.

Thus, in light of the significant obstacles to ever obtaining full recovery, the bird-in-the-hand Settlement resulting in around $103 for each App Class claimant and $24 for each Purchaser Class claimant is a reasonable estimate of the expected value of continued litigation, and represents a good deal for class members. Indeed, Purchaser Class members' recovery of $24 each constitutes 16% of their average purchase price—and thus maximum recovery—of $150, a

ratio that exceeds other approved settlements. *See, e.g., Schulte*, 805 F. Supp. 2d at 583-84 (approving settlement representing 10% of maximum potential recovery, and noting that "[n]umerous courts have approved settlements with recoveries around (or below) this percentage") (collecting cases). Further, the Purchaser Class members' recovery adequately compensates them for the premium they paid for the We-Vibe's Bluetooth control functions that were claimed to be rendered worthless by those features' collection and disclosure of personal usage information. And while the App Class recovery of $103 each represents a lower percentage of maximum statutory damages of $10,000, *see* 18 U.S.C. § 2520(c)(2)(B), this recovery nevertheless compares favorably with other settlements in privacy cases, where approved settlements resulting in *no* direct payments to class members are more the norm. *See, e.g., Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir. 2012) (approving multimillion-dollar *cy pres*-only settlement of privacy claims); *In re Google Buzz Privacy Litig.*, No. 10-0672, 2011 WL 7460099 (N.D. Cal. June 2, 2011) (same); *see also Kinder v. Meredith*, No. 14-1128, Dkt. 79, 81 (E.D. Mich. May 18, 2016) (approving state statutory privacy class action settlement providing for recovery of approximately $50 per class member, which represented 1% of $5,000 maximum statutory damages); *Schulte*, 805 F. Supp. 2d at 584 (finding no reason why settlement representing 1% (or less) of maximum potential recovery could not be satisfactory).

In short, given the not insignificant hurdles to success at trial—let alone to ultimate collection of any verdict—the immediate money provided to Class Members through the Settlement equals or exceeds the amount they could reasonably expect to obtain through continued litigation. And this doesn't even take into account the complete prospective relief afforded by the Settlement. Accordingly, the first—and most important—*Synfuel* factor strongly supports final approval of the Settlement.

17

**B.** **The Likely Complexity, Length, And Expense Of Continued Litigation Weighs In Favor Of Final Approval Of The Settlement.**

The second *Synfuel* factor—the likely complexity, length, and expense of continued litigation—also supports final approval of the Settlement. If the Settlement is not approved, Defendant could move to dismiss, requiring complicated briefing on the communications and interception issues noted above. And should Plaintiffs survive a motion to dismiss, discovery will proceed with the parties' marshaling of witnesses and evidence from the United States and Canada to support their arguments on both class certification and the merits. Much of the discovery is likely to be quite technical, and is certain to be costly. *See In re AT&T Mobility*, 789 F. Supp. 2d at 964 (noting that "costs associated with discovery in complex class actions can be significant"). In addition, any decision on class certification, dispositive motions, or judgment at trial would assuredly be appealed by the losing party, further increasing the cost and delay to obtaining ultimate recovery for the classes. In short, this factor too weighs in favor of final approval.

**C.** **The Reaction Of The Settlement Classes Favor Final Approval.**

The third *Synfuel* factor—the amount of opposition to the Settlement by affected parties—likewise favors final approval of the Settlement here. As in this case, lack of opposition to a class action settlement "indicates that the class members consider the settlement to be in their interest." *Am. Int'l Grp., Inc.*, 2012 WL 651727 at *6.

Here, despite the direct notice, the extensive publication notice, and wide media coverage of the Settlement, there have been *zero* objections to the Settlement, and only *one* class member has opted out. (Kealey Decl. ¶ 11-12.)[11] This suggests that class members overwhelmingly approve of the Settlement. *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020-

---

[11]      The Declaration of Kevin Kealey is attached hereto as Exhibit 2.

21 (N.D. Ill. 2000) ("99.9% of class members have neither opted out nor filed objections to the proposed settlements. This acceptance rate is strong circumstantial evidence in favor of the settlements."); *In re AT&T Mobility*, 789 F. Supp. 2d at 964-65 ("[I]t is illuminative that only a tiny fraction of the Class Members saw fit to opt out or to object."). Consequently, this factor, too, weighs strongly in favor of final approval.

### D. Experienced Counsel's Belief That The Settlement Is Beneficial To The Class Weighs In Favor Of Final Approval.

The fourth factor to consider—the opinion of competent counsel—also supports final approval of the Settlement. As the Seventh Circuit has noted, "[w]hile the court, of course, should not abdicate its responsibility to review a class action settlement merely because counsel support it, the court is entitled to rely heavily on the opinion of competent counsel." *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 325 (7th Cir. 1980) *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). Indeed, where class counsel has "extensive experience in consumer class actions and complex litigation," their "belie[f] that the settlement is beneficial to the Class" supports approval of the settlement. *Schulte*, 805 F. Supp. 2d at 586-87; *see also Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97-7694, 2001 WL 1568856, at *3 (N.D. Ill. Dec. 10, 2001) (finding plaintiff's counsel competent, and their endorsement of a settlement thus supporting approval, where counsel were "experienced and skilled practitioners in the [relevant] field, and [were] responsible for significant settlements as well as legal decisions that enable litigation such as this to be successfully prosecuted").

Here, class counsel are well-respected members of the plaintiffs' bar with significant experience litigating and settling electronic privacy class actions similar to this one. (Dkt. 27-3 ¶ 16.) *See also, e.g., In re Facebook Privacy Litig.,* No. 10-2389, Dkt. 69 (N.D. Cal. 2010) (noting that the attorneys at Edelson PC are "pioneers in the electronic privacy class action field, having

litigated some of the largest consumer class actions in the country on this issue"). Based on their experience and their litigation of the instant action, class counsel believe that the claims at issue are appropriate for settlement, and that the relief obtained through the Settlement is beneficial to the classes, especially when weighed against the expected value of continued litigation. (Dkt. 27-3 ¶ 19.) *See also supra* Part V.A. Courts place "significant weight" on such opinions of counsel, *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1020, and this factor thus strongly weighs in favor of granting final approval to the Settlement as well.

**E.    The Stage Of The Proceedings And Amount Of Discovery Completed Weigh In Favor Of Final Approval.**

The final *Synfuel* factor—the stage of proceedings and amount of discovery completed—also supports final approval here. This factor is relevant in determining "how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Armstrong*, 616 F.2d at 325. "[T]he label of 'discovery' is not what matters. Instead, the pertinent inquiry is what facts and information have been provided." *In re AT&T Mobility*, 789 F. Supp. 2d at 967; *see also Schulte*, 805 F. Supp. 2d at 587-88. In fact, formal discovery can add unnecessary expense and delay—to the detriment of class members—when information could otherwise be obtained through investigation or informal exchange. *See In re AT&T Mobility*, 789 F. Supp. 2d at 966-67.

Here, prior to filing suit, class counsel thoroughly investigated the We-Vibe product line including the ways in which those products interact with the We-Connect App and use their Bluetooth functionality. *See* Scott Flaherty, *Edelson Credit In-House Forensics Lab for Its Success in Data Security and Privacy Litigation*, American Lawyer (7-12-17), available at goo.gl/Xc4Bi9. Furthermore, prior to settling, the parties engaged in extensive informal discovery, with class counsel obtaining information relating to Defendant's data collection practices, Defendant's privacy policies, disclosures made by Defendant to consumers, the

number of class members, available insurance, and Defendant's financial resources. (*Id.* ¶ 4.) All of this information ensured that the parties had more than sufficient information about their respective litigation positions, and that Plaintiffs and class counsel were able to effectively represent the classes' interests in negotiating the Settlement. Indeed, the favorable Settlement speaks for itself. *See Schulte*, 805 F. Supp. 2d at 588 ("[A]s the Seventh Circuit has suggested, the fact that Class Counsel negotiated a fair settlement is evidence that [they] had enough information to effectively represent the class.") (citing *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir. 1987)).

Accordingly, like the other four factors, the fifth and final *Synfuel* factor also weighs in favor of final approval of the Settlement.

**F.    The Settlement Raises No Red Flags.**

Finally, in addition to satisfying all five *Synfuel* factors, this Court should not hesitate to grant final approval to the Settlement because it raises none of the red flags identified by the Seventh Circuit in analyzing class settlements. In *Eubank v. Pella Corp.*, the Seventh Circuit found present "almost every danger sign in a class action settlement that our court and other courts have warned district judges to be on the lookout for." 753 F.3d 718, 728 (7th Cir. 2014). Those signs included (i) a single class containing two adverse subgroups, (ii) a family relationship between class counsel and the class representative, (iii) failure to establish the amount of class member recovery, (iv) the reversion of any unawarded attorneys' fees to defendant, (v) an advance of attorneys' fees before notice of the settlement was provided to class members, (vi) a provision in the settlement agreement denying incentive awards to class representatives who objected to the settlement, (vii) the provision to some class members of only

coupons, and (viii) a complicated claims procedure creating substantial obstacles to recovery. *Id.* at 721-28.

Here, none of those red flags are present. First, while there are two classes, they are not adverse (most class members are in both classes), and each class has its own class representative. *Cf. id.* at 721. Nor is either class representative related to Class Counsel. And unlike in *Pella*, where the settlement was approved before the claims deadline had passed, *id.* at 723, the amount of Plaintiffs' recovery—both individually and in the aggregate—is known. Any unawarded attorneys' fees will be distributed to class members, not revert to Standard Innovations; there has been no advance of attorneys' fees to class counsel; and there is no provision in the Settlement Agreement denying an incentive award to a named plaintiff who does not support the Settlement. Finally, the claims process is exceedingly simple—requiring just the provision of contact information, an affirmation of class membership, and a device serial number, where available— in order for claiming class members to recover, and all such claimants will receive cash, not coupons.

Simply put, the Settlement here is beneficial to class members, and displays no warning signs that should give this Court pause. The Settlement should therefore be approved.

## VI.    CONCLUSION

Because the Court-approved notice plan was effectively executed; because all five *Synfuel* factors establish that the Settlement is fair, reasonable, and adequate; and because none of the red flags identified by the Seventh Circuit in *Pella* are present here, Plaintiffs N.P. and P.S. respectfully request that the Court enter an order granting final approval to the Settlement, and providing such other and further relief as it deems reasonable and just.

Respectfully submitted,

Dated: July 24, 2017

**N.P.** AND **P.S.**, INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED,

By: /s/   Eve-Lynn J. Rapp
One of Plaintiffs' Attorneys

Jay Edelson
jedelson@edelson.com
Benjamin Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Eve-Lynn J. Rapp
erapp@edelson.com
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.234.5262
Fax: 415.373.9435

*Counsel for Plaintiffs and the Putative Classes*

## <u>CERTIFICATE OF SERVICE</u>

I, Eve-Lynn J. Rapp, an attorney, hereby certify that on July 25, 2017, I served the above and foregoing ***Plaintiffs' Motion for and Memorandum of Law in Support of Final Approval of Class Action Settlement*** by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

<u>/s/ Eve-Lynn J. Rapp</u>